## BIGELOW ET AL. *v.* RKO RADIO PICTURES, INC. ET AL.

No. 444. Argued February 7, 1946.—Decided February 25, 1946.

*Thomas C. McConnell* argued the cause for petitioners. With him on the brief was *Hubert Van Hook.*

*Edward F. McClennen* argued the cause for respondents. With him on the brief was *Miles G. Seeley.*

*Solicitor General McGrath, Assistant Attorney General Berge* and *Charles H. Weston* filed a brief for the United States, as *amicus curiae,* in support of petitioners.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Petitioners brought this suit in the District Court for Northern Illinois under §§ 1, 2 and 7 of the Sherman Act (26 Stat. 209), and §§ 4 and 16 of the Clayton Act (38 Stat. 731), 15 U. S. C. §§ 1, 2, 15, and 26, for an injunction and to recover treble damages. Petitioners, who are owners of the Jackson Park motion picture theatre in Chicago, alleged by their bill of complaint that respondents, some of whom are distributors of moving picture films and some of whom own or control moving picture theatres in Chicago, entered into a conspiracy which continued from

some date prior to November 1, 1936 to the date the suit was brought, July 28, 1942, pursuant to which film was distributed among moving picture theatres in the Chicago district in such a manner that theatres owned by some of the conspirators were enabled to secure and show feature pictures in advance of independent exhibitors, not affiliated with respondents, such as petitioners.

The gist of the complaint is that, by reason of the conspiracy, petitioners were prevented from securing pictures for exhibition in their theatre until after the preferred exhibitors had been able to show them in the earlier and more desirable runs, and that petitioners have thus been discriminated against in the distribution of feature films in favor of competing theatres owned or controlled by some of the respondents. Petitioners charged that in consequence they had been subjected to loss of earnings in excess of $120,000 during the five year period from July 27, 1937 to July 27, 1942. The matter of the injunction was reserved and the case went to trial solely on the question of damages. The jury returned a verdict for $120,000 in petitioners' favor. The trial court gave judgment for treble that amount, as prescribed by § 4 of the Clayton Act. The Circuit Court of Appeals for the Seventh Circuit reversed on the sole ground that the evidence of damage was not sufficient for submission to the jury, and directed the entry of a judgment for respondents *non obstante veredicto.* 150 F. 2d 877. We granted certiorari, 326 U. S. 709, because of the importance of the problem presented.

Respondents do not now assail the jury's verdict, so far as it found an unlawful conspiracy to maintain a discriminatory system of distribution. The sole question for decision here is whether the evidence of damage is sufficient to support the verdict. As the jury returned a general verdict, the nature and extent of the unlawful conspiracy must be ascertained in the light of the instruc-

tions given to the jury, taking that view of the evidence most favorable to petitioners. Petitioners have been since November 1, 1936 the owners in partnership of the Jackson Park Theatre, located on the south side of Chicago. Respondents RKO Radio Pictures, Inc., Loew's, Inc., Twentieth Century-Fox Film Corporation, Paramount Pictures, Inc., and Vitagraph, Inc., are distributors of motion picture films. Respondent RKO also owns two large first-run theatres in the Chicago Loop. Respondent Balaban & Katz Corporation is a motion picture exhibitor, which operates a chain of some fifty theatres in Chicago and its suburbs, including the Maryland Theatre and others on the south side of Chicago which compete with the petitioners' Jackson Park Theatre. Balaban & Katz is a subsidiary of Paramount. Respondent Warner Bros. Circuit Management Corporation is an exhibitor which operates more than twenty theatres in Chicago, including several on Chicago's south side which also compete with petitioners' theatre. Warner Bros. Circuit Management Corporation and Vitagraph are subsidiaries of Warner Bros. Pictures, Inc. Respondent Warner Bros. Theatres, Inc., is also affiliated with Warner Bros. Pictures, Inc. and holds title to certain of the Warner theatres.

There was evidence from which the jury could have found that respondents maintained in the Chicago district, by a conspiracy among themselves, a discriminatory system of distributing motion pictures for showing in successive weeks of release. The release system, as described in the complaint, and shown by the proof, operated substantially as follows: Respondent distributors rent their copyrighted product to motion picture theatres for exhibition to the public. Rental contracts between distributors and exhibitors undertake to furnish films to the exhibitors for stipulated rentals, and provide for the "playing position" in which the motion picture theatre is to exhibit the films relative to the "playing position" of other

theatres in the competitive area. In Chicago, these contracts uniformly provide that the larger theatres in the Chicago Loop, all owned, leased, or operated by one or more of the respondents, shall have the right to the "first run" of the motion pictures distributed by the respondents, for one week or such longer period as they may desire to exhibit them. Following the "first run," the motion picture may not be shown in any Chicago theatre outside the Loop for three weeks, a period known as "clearance." In the fourth week following the end of the Loop run, the film is released for exhibition in theatres outside the Loop for successive runs in various theatres, for periods known as the "A", "B" and "C" "pre-release weeks," followed by weeks of "general release."

The earlier a playing position, the more desirable it is, since it is preferable to exhibit pictures before they have been shown to the public in other theatres in the competitive area. There was evidence that respondent distributors and exhibitors conspired to give to the distributor-controlled or affiliated theatres preferential playing positions in the release system over the positions allotted to independent competing theatres, including that of petitioners, with the result that petitioners' theatre was unable to obtain feature films until the first week of "general release," or ten weeks after the end of the Loop run. By that time most of respondent exhibitors' theatres, with several of which petitioners' theatre competes, and which enjoyed the prior "A", "B" or "C" pre-release runs, had finished their showings. Regardless of the price offered for rental of film, the respondent exhibitors, in execution of the conspiracy, refused to release films to petitioners' theatre except for the first week of "general release."

Although petitioners' ground for recovery, as stated by their bill of complaint, was the discriminatory operation of the system of releasing pictures for showing in allotted playing positions, whereby the petitioners were prevented

from acquiring films for exhibition until they had been shown in respondent distributors' theatres competing with the Jackson Park, evidence was introduced in the course of the trial tending to show that respondents conspired to maintain the release system as part of a conspiracy to maintain minimum admission prices to be charged by exhibitors generally. This proof indicated that the object of this conspiracy was to make it possible to maintain high admission prices in the Loop theatres by restricting the price competition of the subsequent-run theatres. The distributors' contracts with the Loop theatres provided for film rentals based on a percentage of the admission fees collected. It appeared that the rental contracts entered into between respondent distributors and the Chicago exhibitors, including respondent exhibitors and petitioners, uniformly contained schedules of minimum admission prices fixed on the basis of the playing position assigned. There was thus evidence tending to show that the release system and the price-fixing system were each an integral part of an unlawful conspiracy to give to the Loop theatres the advantages of a first-run protected from low-price competition.

Respondents' evidence, on the other hand, tended to show that the release system was a natural growth in the industry, and that the fixed-price system had resulted from the individual action of distributors, not acting in concert, to market their copyrighted product in such a manner as to secure the best possible financial return from the film distributed. See *Interstate Circuit* v. *United States*, 306 U. S. 208; consent decree in *United States* v. *Balaban & Katz Corp.*, C. C. H. Fed. Trade Reg. Serv., 7th ed., Court Decisions Supplement, p. 5025.

Two classes of evidence were introduced by petitioners to establish their damage. One was a comparison of earnings during the five year period of petitioners' Jackson Park Theatre with the earnings of its competitor, the

Maryland Theatre, the two being comparable in size, the Jackson Park being superior in location, equipment, and attractiveness to patrons. Under the discriminatory release system, the Maryland had been allowed to exhibit pictures in the C pre-release run, one week ahead of petitioners' first week of general release. The evidence showed that during the five year period, the Maryland's net receipts after deducting film rentals paid to distributors exceeded petitioners' like receipts by $115,982.34.

The second was a comparison of petitioners' receipts from the operation of the Jackson Park Theatre less cost of film for the five year period following July 1937, with the corresponding receipts for the four years immediately preceding, after making an allowance for the elimination of "Bank Night" receipts. The comparison shows a falling off of petitioners' receipts during the five year period aggregating $125,659.00, which was more than $5,000 in excess of the $120,000 damage demanded by petitioners' complaint. The significance of the comparison lies in the fact that during most of the four year period, and despite the operation of the release system as described, petitioners' theatre had been able to procure some films which had not already been shown in respondents' theatres, whereas petitioners were not able to procure such films during the five year period which followed, although there is evidence that they made diligent efforts to do so. The change is attributable to the introduction of the practice of "double features" (the showing of two films at a single performance) in theatres in the Chicago district. The evidence tended to show that when single features were being shown, exhibitors who had playing positions ahead of petitioners', in selecting films out of those which their rental contracts allowed them to show, did not exhibit all of the films distributed, so that, despite their inferior playing position, petitioners were able to exhibit pictures which had not been shown elsewhere. With the advent of double

featuring, theatres with playing positions ahead of petitioners' used nearly all of the films distributed, and the pictures which petitioners were able to exhibit in the first week of general release, by reason of the distribution system, had had prior showing in nearly every case.

The trial court left it to the jury to say whether double featuring was introduced as a part of a conspiracy among respondents, or as a spontaneous manifestation in the industry. Assuming the latter, we agree with the circuit court of appeals, which, in sustaining the jury's finding of an unlawful conspiracy to maintain the described system of distribution, held that when the double featuring was established, all film which had not already been shown "was taken away by defendants' prior contracts, made pursuant to and as a part of the conspiracy, and placed under the restriction of the illegal system, and thereafter was not obtainable by plaintiffs, except by use of the illegal system."

In submitting the two classes of evidence of damage which we have detailed, the trial court stated to the jury: "Plaintiffs seek to recover damages for the alleged acts of defendants on one of two theories . . ." It further charged that "If . . . plaintiffs have been injured by the alleged acts of defendants, they must choose one or the other of said two theories of determining damage or the amount of damages." The circuit court of appeals concluded that the jury accepted the comparison of plaintiffs' earnings before and after the adoption of double billing as establishing the measure of petitioners' damage. But it held that this proof did not furnish a proper measure of damage for the reason that, while petitioners' earnings were known and proved for both the four and five year periods in question, it could not be proved what their earnings would have been during the five year period in the absence of the illegal distribution of films. It thought that the mere fact that earnings of the Jackson Park The-

atre were greater before the adoption of double billing did not serve to show what petitioners' earnings would have been afterwards, in the absence of the release system.

Similarly, the court of appeals rejected the comparison between petitioners' receipts and those of the Maryland Theatre during the five years in question, since, as it thought, the comparison would not tend to prove what the earnings of either theatre would have been during the critical period under any system other than that which was the product of the unlawful conspiracy.

Upon the record in this case it is indisputable that the jury could have found that during the period in question a first or prior run theatre possessed competitive advantages over later run theatres, because of its greater capacity to attract patronage to pictures which had not been shown elsewhere, and its ability to charge higher admission prices than subsequent run theatres, and that, other things being equal, the establishment of the discriminatory release system was damaging to the petitioners, who were relegated by it to a playing position inferior to that of their competitors.

Each of the two classes of evidence introduced by petitioners tended to show damage. They were not mutually exclusive, as the courts below seem to have thought, since each, independently of the other, tended to show that petitioners' inability to obtain films for exhibition before they had been shown elsewhere adversely affected their receipts, in the one case by showing that those receipts decreased when petitioners could no longer purchase such films following the introduction of double features, and in the other, that petitioners' receipts from its theatre were less by substantially the same amount than receipts of its competitor, the prior-run Maryland Theatre, operated under conditions in other respects less favorable than those affecting petitioners.

Respondents' argument is, that notwithstanding the force of this evidence, it is impossible to establish any

measure of damage, because the unlawful system which respondents have created has precluded petitioners from showing that other conditions affecting profits would have continued without change unfavorable to them during the critical period if that system had not been established, and petitioners had conducted their business in a free competitive market. Respondents also contend that the jury's verdict establishes that the release system was part of a price-fixing conspiracy, and on the assumption that price-fixing and the discriminatory system of release were inseparable parts of a single scheme, argue that as the conspiracy as a whole probably enabled petitioners artificially to raise their prices to an undetermined extent, the overall effect of the conspiracy may well have been to benefit petitioners, even though the plan of distribution, one of its features, may have injured them. But we think these arguments are based on a misapprehension of the precise conditions in which the jury was permitted to and did apply the tendered measure of damages, and that it also ignores controlling principles of the law of damages.

We have already adverted to the facts that petitioners' cause of action, as stated in their complaint, was founded on the unlawful system of distributing films; that the contentions pro and con as to the existence of a conspiracy to fix prices of theatre admissions first emerged in the course of the trial; and that the jury was allowed to fix the measure of the damage with reference to the reduction of petitioners' receipts after July 1937 when petitioners were no longer able to show some films which had not been previously exhibited. Under the complaint and the instructions, the jury could, and we can assume that it did, find that the fixing of minimum prices was effectuated by the individual action of distributors, as respondents contended at the trial, and not as a part or result of the conspiracy to control distribution. The jury could have found that the only unlawful action taken by respondents was in

conspiring to prevent petitioners' theatre from bidding in open competition against other exhibitors for a preferred place in an otherwise lawful system of release. This is, apparent from the following portion of the charge: "Only in the event that you find that there exists no conspiracy or combination to fix minimum admission prices, or no unreasonable restraint of trade, by the defendants by virtue of the Chicago system of release, will you have occasion to consider whether or not the plaintiffs demanded and sought to obtain a playing position in 'C' week."

The jury's verdict was, as the court below held, based on the damage suffered by petitioners in consequence of the deprivation, by the discriminatory operation of the release system, of their demonstrated freedom to rent and exhibit some films which had not had prior showing. Hence we take it that the verdict did not establish that the fixed minimum admission prices were the result of the unlawful conspiracy, or that the petitioners' purchases of such films, and the operation of their theatre, before the double feature practice was inaugurated, were, for purposes material here, affected by the conspiracy.

The record thus establishes that when petitioners acquired their theatre, it was possible for them under the conditions then prevailing to secure films which had not had prior showing and to exhibit them in competition with theatres having preferred playing positions. Whatever restraints respondents' distribution system may then have imposed, and whether the later adopted practice of showing double features was or was not itself a product of an unlawful conspiracy, petitioners were entitled, as of right, to continue to purchase and show films which had not had prior showing free of the restraints of the unlawful distribution system. The fair value of petitioners' right thus to continue their business depended on its capacity to make profits. And a fair measure of the damage to that

right by respondents' unlawful distributing system was the loss of petitioners' admission receipts resulting from the application of that system to petitioners.

Respondents only answer is that, without the conspiracy, the conditions of purchase of films might not have been the same after as they were before July, 1937; that in any case it is not possible to say what those conditions would have been if the restraints had not been imposed, and that those conditions cannot be ascertained, because respondents have not removed the restraint. Hence, it is said, petitioners' evidence does not establish the fact of damage, and that further, the standard of comparison which the evidence sets up is too speculative and uncertain to afford an accurate measure of the amount of the damage.

The case in these respects is comparable to *Eastman Kodak Co.* v. *Southern Photo Co.,* 273 U. S. 359, and *Story Parchment Co.* v. *Paterson Co.,* 282 U. S. 555, in which precisely the same arguments now addressed to us were rejected. There, as here, the suits were for damages caused by restraints imposed by defendants, in violation of the Sherman Antitrust Act, on the operation of the business of the complainant in each case. In the one case, the defendant, in an effort to extend its monopoly, refused to sell to the plaintiff goods which had regularly been a part of his stock in trade. In the other, the defendants, competing sellers, engaged in destructive price competition with the plaintiff in execution of an unlawful conspiracy. In the first case, the plaintiff sought to establish his damage by comparing his profits before and after the unlawful interference with his business. In the other, the plaintiff sought to show his damage by proof of the difference between the amounts actually realized from his business after the conspiracy became effective, and what, but for the conspiracy, would have been realized by it from sales at reasonable prices, the evidence of which was the

amount by which his current prices were higher before the conspiracy than after, and by the extent to which the value of plaintiff's business property had declined after the conspiracy had begun to operate.

In each case we held that the evidence sustained verdicts for the plaintiffs, and that in the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs. In this we but followed a well-settled principle. See *Hetzel* v. *Baltimore & Ohio R. Co.*, 169 U. S. 26, 38–9. The tortious acts had in each case precluded ascertainment of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions. Nevertheless, we held that the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible.

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof." *Story Parchment Co.* v. *Paterson Co., supra,* 561–4; *Eastman Kodak Co.* v. *Southern Photo Co., supra,* 377–9. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages un-

certain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See *Package Closure Corp.* v. *Sealright Co.*, 141 F. 2d 972, 979. That principle is an ancient one, *Armory* v. *Delamirie*, 1 Strange 505, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application. In cases of collision where the offending vessel has violated regulations prescribed by statute, see *The Pennsylvania*, 19 Wall. 125, 136, and in cases of confusion of goods, *Great Southern Gas & Oil Co.* v. *Logan Natural Gas & Fuel Co.*, 155 F. 114, 115; cf. *F. W. Woolworth Co.* v. *Labor Board*, 121 F. 2d 658, 663, the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable. And in cases where a wrongdoer has incorporated the subject of a plaintiff's patent or trade-mark in a single product to which the defendant has contributed other elements of value or utility, and has derived profits from the sale of the product, this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits. *Westinghouse Co.* v. *Wagner Mfg. Co.*, 225 U. S. 604; *Hamilton Shoe Co.* v. *Wolf Brothers*, 240 U. S. 251; see also *Sheldon* v. *Metro-Goldwyn Corp.*, 309 U. S. 390, 406.

"The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery" for a proven invasion of the

plaintiff's rights. *Story Parchment Co.* v. *Paterson Co., supra,* 565; and see also *Palmer* v. *Connecticut R. Co.,* 311 U. S. 544, 559, and cases cited.

The evidence here was ample to support a just and reasonable inference that petitioners were damaged by respondents' action, whose unlawfulness the jury has found, and respondents do not challenge. The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage.

We do not mean to indicate by what we have said that the jury could not, on this record, have found a conspiracy for fixing minimum prices or that the Chicago system of release was not an unreasonable restraint of trade in other respects. We conclude that there was evidence to support a verdict for damages on at least one theory on which the case was submitted to the jury. We do not imply that the verdict could not be supported on some other theory.

The judgment of the district court below will be affirmed and the judgment of the court of appeals is

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

The dominant purpose of the Anti-Trust Acts is protection of the public interest by prohibiting unjustifiable restrictions upon competitive enterprise. From the very nature of the public interest thus to be safeguarded and by reason of the complex and costly character of the litigation to which it normally gives rise, Congress made available to the Attorney General of the United States appropriate

preventive and punitive remedies: the injunction, to put a prompt stop to illegal restraints, and the stern sanctions of the criminal law, to deter such restraints. A right of action is also given to any individual who has been "injured in his business" by such illegality. But while action by the Government to enforce the Anti-Trust Acts merely requires proof of illegality, an individual's right of recovery is dependent on proof of legal injury to him, and legal injury is not automatically established by proof of a restraint of trade in violation of the Sherman Law. See *Keogh* v. *Chicago & Northwestern R. Co.,* 260 U. S. 156, 162–63.

Therefore our real question is whether the respondents' violation of the Sherman Law illegally injured the petitioners. This necessarily involves substantial proof that the petitioners' business would have been more profitable if the distribution of movie films in Chicago had been a free-for-all and if no factor of the scheme that constituted an illegal conspiracy had been in operation, than it was under the conditions that actually prevailed. Specifically, one feature of the conspiracy was stipulated rentals by distributors in furnishing films to exhibitors. The record appears devoid of proof that, if competitive conditions had prevailed, distributors would not have made rental contracts with their respective exhibiting affiliates to the serious disadvantage of independents like the petitioners. They might individually have done so and not have offended the Sherman Law.

I agree that *Eastman Kodak Co.* v. *Southern Photo Co.,* 273 U. S. 359, and *Story Parchment Co.* v. *Paterson Co.,* 282 U. S. 555, should guide the disposition of this case. But I do not find that the decisive distinction made in those cases has been observed in deciding this case. The distinction is between proving that some damages were "the certain result of the wrong" and uncertainty as to the dollars and cents value of such injuring wrong. Such

difficulty in ascertaining the exact amount of damage is a risk properly cast upon the wrong-doing defendant. But proof of the legal injury, which is the basis of his suit, is plaintiff's burden. He does not establish it merely by proving that there was a wrong to the public nor by showing that if he had been injured ascertainment of the exact amount of damages would have had an inevitable speculative element to be left for a jury's conscientious guess. This basic distinction was thus formulated in *Story Parchment Co.* v. *Paterson Co.*:

> "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." 282 U. S. at 562.

In the *Eastman* and *Story* cases the plaintiffs established what their profit was when competitive conditions prevailed and that the subsequent loss properly became exclusively attributable to restraint of such conditions. Such a comparison is not revealed by this record. It was wholly speculative, as the Circuit Court of Appeals properly held in applying the rule in the *Story Parchment Co.* case, whether the intake of petitioners would have been more profitable if the distribution of films in Chicago had been left wholly to the haggling of a free market, 150 F. 2d 877. As to the subtleties involved in such speculation, compare *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 223–24.

Where there is conceded legal injury, as for instance where one man's chattel is taken by another, as in the old case of *Armory* v. *Delamirie*, 1 Strange 505, we start with the legal injury and the problem is merely one of ascertaining damages "uncertain in respect of their amount." Such cases are not helpful where the crucial issue, as here, is whether there is solid proof of the existence of a legal injury.