John SZEKELY, also known professionally as John Pen, Plaintiff-Appellee,

v.

EAGLE LION FILMS, Inc., Defendant-Appellant,

and

General Film Distributors, Ltd.; J. Arthur Rank, Rod Geiger and Nat Bronsten, Defendants.

No. 146, Docket 24199.

United States Court of Appeals Second Circuit.

Argued Feb. 4, 1957.

Decided March 19, 1957.

Phillips, Nizer, Benjamin & Krim, New York City (Louis Nizer, Walter S. Beck, Seymour Shainswit, New York City, of counsel), for defendant-appellant.

Fitelson & Mayers, New York City (Benjamin Aslan, Harold J. Sherman, New York City, Howard Gotbetter, Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before CLARK, Chief Judge, MEDINA, Circuit Judge, and SMITH, District Judge.

J. JOSEPH SMITH, District Judge.

In 1937 Pietro di Donato wrote a short story, which he later developed into a novel entitled "Christ in Concrete." The novel was published by Bobbs-Merrill and copyrighted in 1937 and 1939. Subsequently Rod E. Geiger Productions, Inc. acquired from di Donato an exclusive license to produce a motion picture based on his novel. To exploit this license Geiger Productions contracted with the appellee, Szekely, also known as John Pen, a well-known and successful writer for the screen, to write a screen play based on this novel, all rights and title in the manuscript to remain in Szekely until he received the agreed minimum compensation for his efforts, $35,000. Szekely received only $10,000 from Geiger before he presented the final draft of his script in 1948, after which he received no further payments. Geiger ran into financial difficulties and found it necessary to make extensive revision to meet a reduced expense budget for the production. The Szekely script was modified by Barzman, a writer employed by Geiger Productions in 1948, and in 1949 the filming of the picture was commenced. Distribution rights to the film were granted to General Film Distributors, Ltd. of England which regranted their distribution rights in the Western hemisphere to the appellant, Eagle Lion Films. Plaintiff was informed by Geiger that his screen play was not being used in the movie version. After learning that it was being so used, plaintiff chose not to sue in England to enjoin such use by Geiger, but notified defendant Eagle Lion of his rights in the movie in November 1949 prior to Eagle Lion's distribution, notified Eagle Lion in February 1950 of intention to bring action, and commenced suit on April 18, 1950.

Szekely brought suit against Eagle Lion and Rod Geiger, individually, on the alleged infringement of his common law copyright. The suit as against Geiger was dismissed by consent, on trial the claim for an accounting was abandoned, and from a judgment for Szekely against Eagle Lion for $25,000 damages and interest, Eagle Lion appeals.

Appellant's first point is that plaintiff was himself an infringer. There is no merit in this claim, for plaintiff's dramatization was made under con-

tract with Geiger. Geiger was the holder of the right to dramatize by assignment from the author, owner of the copyright on the novel. Cf. Photo-Drama Motion Picture Co. v. Social Uplift Film Corp., 2 Cir., 220 F. 448, 449.

■ Appellant's second point is that plaintiff's deliberate inaction led to Eagle Lion's distribution of the film, and that plaintiff is barred from recovery by estoppel and laches. It is difficult to see how this claim can be seriously advanced, for the court found, on competent evidence, that Eagle Lion had notice of plaintiff's claim several weeks prior to the first distribution and chose to ignore it, and there was other evidence that distribution continued after further warning and, indeed, for some years after suit was brought.

■ Appellant's third point is that plaintiff was merely a joint owner and that license from Barzman, co-owner, entitled the producer to publish without plaintiff's consent. This flies in the face of the contract itself, which retained title to the screen play in plaintiff until payment of the $25,000 balance agreed on. Plaintiff's Exhibit 5, paragraph 6. Moreover, Barzman's adaptation of plaintiff's screen play, to meet the producer's changed circumstances, was not contemplated at the inception of the work, which was not planned as a joint work. Collaboration, if necessary, was contemplated by the contract, plaintiff's Exhibit 5, paragraph 11, but only on plaintiff's consent, which was not sought or obtained. The work was not, therefore, a joint work. Cf. Shapiro Bernstein & Co. v. Jerry Vogel Music Co., 2 Cir., 221 F.2d 569. Plaintiff completed and delivered his separate work. Geiger did not pay the balance due, not because the plaintiff's work was not complete, but solely because of Geiger's financial difficulties.

■ The film when completed could be published only with the joint consent of Geiger, which held the movie rights in the novel and in Barzman's work, and of plaintiff, who retained as security the literary property in the screen play written by him under contract with Geiger.

Appellant published the film with notice of plaintiff's property in the screen play incorporated in the film. Its publication brought in a return of $46,719.84 from which it remitted to Geiger $29,758.04 as the producer's share. Had appellant not published the film, it would have been salable to someone else by Geiger with plaintiff's consent. The right to withhold that consent as security for the $25,000 due plaintiff cannot be said to be entirely worthless. The film brought in to Geiger, from an American distributor who knowingly infringed plaintiff's copyright, $29,758.04. We do not know what if anything was realized from distribution outside the United States. Security title to the film play incorporated in the film became worthless only when the market for the film was destroyed by publication. The value of the security title is difficult to establish. However, the price agreed on between plaintiff and Geiger is some gauge. We cannot tell and need not speculate what the film would have done in the hands of another distributor. But a deliberate infringer should not be able to say that the screen play common law copyright was worthless because the infringer didn't make expenses on the infringement, in the face of its payment to the producer of an amount in excess of the amount as security for which the plaintiff retained the rights in the screen play. Geiger obtained $29,758.04 from appellant for American distribution rights to all that went into the production, including Geiger's movie rights in the novel and plaintiff's rights in the screen play. Yet neither that amount nor the $46,719.84 grossed by the infringer from the distribution, are allocated by the proof to the particular elements that went into the production and distribution. It is possible that shortcomings of the rewriting and production caused by Geiger's financial woes detracted from rather than added to the value of plaintiff's screen play. We need not speculate, however, for the evidence shows that plaintiff and Geiger in free bargaining, set a value on plaintiff's work of $35,000 plus 5% of any producer's profits. As security for the payment of $25,-

000 of that amount plaintiff's rights in the play were retained. There is nowhere any indication that plaintiff's work fell below the standard expected and contracted for by Geiger. The infringer cannot cast on the holder of the rights the burden of unscrambling the elements of value in the movie, when it deliberately infringed with notice of rights in it held as security. Such is the rule on accounting, Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 45, 48. Under the circumstances in the case at bar we may well adopt a similar rule where the issue is the value of a constituent portion of the picture exhibited by the infringer. Showing of the amount which the rights secured ($25,000) and that the infringer received and paid over to the producer, who had agreed to the security title, in excess of that amount is a sufficient showing of a value of $25,000 as against the infringer. Compensatory damages, as compensation, indemnity or restitution for harm sustained by a plaintiff for conversion of a chattel or destruction of any legally protected interest in land or other thing, include the exchange value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, or a different value where that is necessary to give just compensation. Restatement, Torts, sec. 927(a).

■■ We may well apply that rule to the measurement of the damages due plaintiff for the conversion of his literary property here. The market value of that property as at least $25,000 at the time of the conversion is supported by its appraisal by plaintiff and Geiger in their dealings prior to the conversion. Even if it were held that those negotiations are not some evidence of a market value, under the second branch of the rule the plaintiff should be allowed to recover for the security value placed upon it and known to defendant before the conversion, as a different value necessary to give just compensation. This is not a case where there was no market for plaintiff's property. Geiger, even if financially embarrassed, had a property salable in conjunction with plaintiff's. The two together had a substantial value, as proved by the terms of acquisition of the territorial rights by Eagle Lion. Until Eagle Lion distributed the film, plaintiff's rights were part of a salable bundle. Geiger at least was a potential market for plaintiff's rights. When Eagle Lion distributed the film, in violation of plaintiff's rights, the market ended. The legal injury is certain. We should not allow difficulty in ascertaining precisely the value of the right destroyed, which difficulty arises largely from the destruction, to enable the infringer to escape without compensating the owner of the right. Compare the rule of damages in antitrust cases. Bigelow v. R. K. O., Radio Pictures, 327 U.S. 251, 263–266, 66 S.Ct. 574, 90 L.Ed. 652.

Affirmed.