**Leo PELTIER, for himself and as representative of a class of persons similarly situated, Plaintiff-Appellant,**

**v.**

**EXXON CORPORATION, Defendant-Appellee.**

**No. 74–1875.**

United States Court of Appeals, Ninth Circuit.

Dec. 23, 1975.

---

Lawrence Alioto (argued), San Francisco, Cal., for plaintiff-appellant.

William Simon (argued), of Howrey, Simon, Baker & Murchison, Washington, D.C., for defendant-appellee.

## OPINION

Before MERRILL and BROWNING, Circuit Judges, and MURRAY,* District Judge.

MERRILL, Circuit Judge:

Peltier appeals from judgment of the District Court for the District of Oregon directing a verdict for the defendant, Exxon, at the close of Peltier's case. The judgment was based on the court's conclusion that Peltier had failed to present evidence from which a jury could find that defendant's acquisition of certain gasoline distribution properties from Signal Oil Company division of Standard Oil of California was a violation either of § 7 of the Clayton Act or § 1 of the Sherman Act. It was also based on the court's conclusion that Peltier had failed to present sufficient evidence from which a jury could ascertain the amount of damages suffered. Both rulings are assigned as error.

On March 31, 1967, Humble Oil and Refining Company was a wholly owned subsidiary of Standard Oil Company of New Jersey. (It has since merged with its parent and the parent's name has since been changed to Exxon Corporation.) On that date, Signal Oil Company was a division of Standard Oil Company of California. On that date, Humble acquired from Standard of California some 1480 Signal service stations and 108 Sig-

* Hon. William D. Murray, Senior United States District Judge from the District of Montana, sitting by designation.

nal distributorships in the states of California, Washington, Oregon and Idaho. On that date, Peltier was, under a three-year contract, engaged in business as a gasoline delivery agent for Signal, operating in Deschutes and Crook counties, Oregon, with deliveries made from Signal's bulk storage plant in Redmond, Oregon. Peltier delivered gasoline to four Signal service stations in this area: two in Redmond, one in Prineville and one in Bend. At the time of acquisition Humble had three service stations in this area, one each in Redmond, Prineville and Bend, and also had its own distributor in the area. Following the acquisition Humble had allowed Peltier's contract to run out and then had failed to renew it, assigning his deliveries to his Humble counterpart. The bulk plant in Redmond was taken over by Humble, along with the four service stations. Of the seven stations this gave Humble, three shortly were abandoned.

In his complaint Peltier charged Humble with horizontal and vertical price fixing, territorial restrictions, attempted monopolization and conspiracy with Humble's distributor for Central Oregon to deprive Peltier of his agency. All these charges have since been abandoned, and the only violation of the antitrust laws on which Peltier now relies as a basis for a § 4 recovery is the acquisition of the Signal facilities.

Section 4 of the Clayton Act, 15 U.S.C. § 15, reads in part:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * ."

Section 7 of the Clayton Act, 15 U.S.C. § 18, reads in part:

"No corporation engaged in commerce shall acquire * * * the whole or any part of the stock * * * [or] assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The district court fixed the three-county area of Central Oregon (Deschutes, Crook, and Jefferson counties) as the relevant geographical market. The leading gasoline marketers in this area were Standard of California, Arco, Shell, Texaco and Union; the area was serviced at the time by some 85 conventional service stations, as well as many grocery stores, restaurants, garages and parking lots that sold gasoline. Plaintiff had alleged in his complaint that the effect of the acquisition was to lessen competition in the 4 western states affected by the merger. He assigns as error the failure of the court to determine the effect upon competition in that area rather than in the small central Oregon area in which he was engaged in business. We need not reach this question in our judgment. The directed verdict must be affirmed for failure of Peltier to present sufficient proof of the amount of damages suffered.

■ It is true, as plaintiff asserts, that in antitrust cases the jury is allowed to determine the amount of damages upon a "just and reasonable estimate . . . based on relevant data." *Bigelow v. R.K.O. Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). However, *Bigelow* also cautioned that "the jury may not render a verdict based on speculation or guesswork," *id.*, and it is on this ground that plaintiff's proof fails.

■ Exhibits introduced by Peltier showed decreasing net profits in 1963 and 1964 and net losses in 1965 and 1966:

| Year | Net Profit or Loss |
|------|-------------------|
| 1963 | $2,409.89 |
| 1964 | 1,002.52 |
| 1965 | (213.24) |
| 1966 | (432.51) |

Significantly, Peltier admitted at trial that there was no basis upon which he could say that this trend would not continue.

Moreover, no evidence was introduced at trial with regard to profit or loss as to

the period from 1967 until the distributorship was cancelled in January 1970. Peltier admitted at trial that such computations could have been made, but that such an effort would have been "far more difficult." Even though the nature of Peltier's business may have been somewhat different after the acquisition in March 1967, we think that evidence relating to the profitability of Peltier's business in its last three years of operation would be essential in making a "just and reasonable estimate" of the amount of damages arising from the loss of the distributorship. The failure to present such evidence is an omission which, in conjunction with the decreasing profit trend and net losses in earlier years, justified the district court's directed verdict on the issue of damages. *See Flintkote Company v. Lysfjord*, 246 F.2d 368, 392–94 (9th Cir. 1957), *cert. denied* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

On appeal Peltier has focused on Exxon's offer in 1968 to buy out his contract at $400.00 a month until its scheduled expiration. Peltier treats this offer as an admission of value, and as such sufficient to allow the issue of damages to go to the jury. We disagree. Even conceding that Exxon's offer is admissible,[1] we do not regard it of such relevance or probative weight as to afford the jury any basis to make a reasonable estimate of damages. Peltier's own exhibits demonstrate that the amount specified in the offer was far from an accurate estimate of Peltier's net earnings.

Appellant also assigns as error the district court's determination of the class action allegations prior to discovery thereon. He argues that "[i]n some instances it may be desirable to permit relevant discovery before deciding whether to allow a class action, particularly when the party opposing the class action is more likely to have access to

information relating to the size and nature of the alleged class." 3B J. Moore, Federal Practice ¶ 23.74 (2nd ed. 1975) (footnote omitted). We see no reason to apply such a rule here. The district court dismissed the class action on the ground that Peltier, as a small volume distributor, was "not an adequate representative of the five-state class of 'Signal jobbers, consignees and dealers' whom he seeks to represent"; the district court further held that Peltier did not meet "the three other requirements of Rule 23(a) or any of the alternative requirements of Rule 23(b)." Appellant has adduced little on appeal to give us cause to question the district court's conclusions, and as such we cannot say that the district court erred in refusing to permit further discovery before dismissing the class action.

Affirmed.

---

1. The same considerations relating to the inadmissibility of offers to compromise disputed claims might well also bar offers to settle contracts prior to their scheduled termination, *see* McCormick, Evidence § 274 (2nd ed. 1972), but in view of our disposition here we need not reach this question.