**DORALEE ESTATES, INC.,**
**Plaintiff-Appellee,**

v.

**CITIES SERVICE OIL COMPANY,**
**Defendant and Third-Party**
**Plaintiff-Appellant,**

v.

**MGO CORP. and Monticello Gas & Oil**
**Co., Inc., Third-Party**
**Defendants-Appellees.**

**No. 149, Docket 77–7121.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 27, 1977.

Decided Dec. 21, 1977.

---

George H. Colin, New York City (Baer, Marks & Upham and Jeffrey L. Liddle, New York City, of counsel), for defendant and third-party plaintiff-appellant.

Gerald Orseck, Liberty (Orseck Law Offices and Robert Orseck, Liberty, of counsel), for plaintiff-appellee.

Joseph D. Ahearn, New York City (Grubbs, Leahy & Donovan, New York City, of counsel), for third-party defendants-appellees.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal arises out of a diversity action brought by plaintiff, Doralee Estates, Inc., to recover for damages to its bungalow colony in Monticello, New York, allegedly caused by an oil spill. Defendant Cities Service Oil Co. (hereinafter "Cities") appeals from a judgment of the United States District Court for the Southern District of New York (Owen, *D. J.*), entered on a jury verdict, and also from an order dismissing Cities' third-party claim against MGO Corp. and Monticello Gas & Oil Co., Inc. (hereinafter collectively "MGO"), and an order denying Cities' motion to reduce the amount of punitive damages fixed by the jury.

Plaintiff alleged that fuel oil waste and other pollutants had been discharged onto its property from an oil terminal operated by MGO and owned and leased by Cities. The jury so found, and awarded $60,000 in compensatory damages and $200,000 in punitive damages. At the close of plaintiff's case, the district court denied a request for a directed verdict dismissing plaintiff's claim. The court granted a motion by MGO to dismiss Cities' third-party claim against it. After verdict, the court denied a motion to set aside the verdict, for judgment notwithstanding the verdict, and for reduction of the punitive damages award. From the denials, Cities appeals.

Cities maintains that the plaintiff failed to establish Cities' liability or to prove any damage, and that the issue of punitive damages should not have been submitted to the jury. It contends also that the court erred in its method of empanelling the jury, and made erroneous and prejudicial rulings at trial.

I

■ Cities contends that under no circumstances could it have been liable for trespass, negligence or nuisance as a matter of law because MGO was obligated, under its lease with Cities, to take all measures that were necessary to abate pollution from the Monticello plant.

Cities was not only the landlord of the oil terminal; it was also the supplier of the oil to MGO. Cities' name appeared on the terminal and its colors and emblems were on the trucks. The lease between Cities and MGO provided that the tenant should maintain the demised premises in good condition and make all non-structural repairs, and that the landlord should make any alteration, improvement, or structural addition required by municipal or government authorities. The landlord also retained the right to enter for inspection or repair, but this right was not to be deemed to impose upon the landlord any obligation to effect repairs. Appellant stands upon the lease.

Whether the lease provisions standing alone would exonerate a lessor from all responsibility to prevent oil runoffs from its leased plant is problematic under New York law. *See Putnam v. Stout*, 38 N.Y.2d 607, 381 N.Y.S.2d 848, 345 N.E.2d 319 (1976).[1] We need not decide the question, however, since there was other evidence from which the jury could conclude that Cities affirmatively undertook, *dehors* the lease, to abate the pollution.

---

1. *Putnam v. Stout, supra,* held that a lessor could be held liable for injuries sustained by a customer of its tenant on the basis of a lease covenant obligating the lessor to keep the premises in good repair.

Cities entered into a stipulation before the New York State Supreme Court in April of 1972, three years after the lease was executed. The stipulation was made in settlement of a lawsuit brought by Doralee Estates against both MGO and Cities to recover for damages caused by oil spillage from the Monticello plant. Under the settlement, plaintiff was to recover $12,500, of which $7,000 was to be paid by Cities and $5,500 by MGO for past damage. For the future, defendants agreed that they would abandon use of the premises for oil distribution purposes or, alternatively, that they would submit construction plans to the court, within sixty days, designed to eliminate the discharge of petroleum products into Doralee's lands and lakes and would commence the implementation of such plans within sixty days after the court's approval.

There was ample factual basis for the jury to find that Cities by the stipulation, undertook independent obligations which exceeded those provided for in the lease, and that Cities breached that stipulation. Although a plan for structural alterations was timely submitted to the court in June of 1972, no alterations were ever begun.[2] Rather, MGO ultimately abandoned the premises in February of 1973, only when its new terminal was completed. The jury might well have concluded that Cities, in fact, never intended to effect changes in the Monticello plant, but had submitted plans solely to buy time until MGO's new site could become operational. Such a strategy would hardly be consistent with the settlement agreement, which contemplated that Cities and MGO would decide whether to abandon or abate, and that either abandonment or abatement would occur in expeditious fashion—not ten months after the stipulation was filed.

There was evidence from which the jury could find that Cities, by its conduct as well as by the stipulation, assumed practical responsibility for whatever repairs were necessary to prevent seepage. Employees of both MGO and Cities testified that *all* structural repairs (and not merely those required by governmental authority) required Cities' approval. According to Sam Green, MGO's manager, Cities paid for the culvert, the containers under oil load racks, and the catch ditch which collected spillage. Leroy Langbein, manager of construction and maintenance for Cities' New York region, acknowledged that Cities made all structural repairs, installed the catch ditch and dismantled the plant. Moreover, an investigator for the New York Department of Environmental Conservation testified that large quantities of oil were spilled, as the plant was dismantled by Cities itself in the summer of 1973.[3] The district court was right, therefore, to submit Cities' liability to the jury, and to deny Cities' motions to set aside the verdict or to direct a judgment n. o. v.

## II

The dismissal of Cities' third-party complaint raises separate questions. Cities' complaint against MGO alleged that it was entitled to indemnity by virtue of the hold harmless clause in the lease. That clause provided:

"Tenant agrees to defend, indemnify and save harmless the Landlord from any and all claims, demands, suits, actions, judgments and recoveries for or on account of damage or injury (including death) to property or person of himself, his family, servants, agents or any other person, firm or corporation, caused by or

2. The court never took action on the plans. Cities' counsel acknowledged at oral argument that the reason was perhaps, indeed, because MGO was then involved in construction of another plant, and the matter was not pressed pending its completion.

3. Cities submits that the seepage onto plaintiff's lands was caused by MGO's negligence in overfilling trucks and permitting an oil separator to become clogged with dirt and snow.

There was, however, testimony from which the jury could have concluded that the oil trap was poorly designed to handle spillage and that, in the circumstances, some overflowing was almost impossible to avoid. In any event, the issue as framed by Cities was not whether MGO was in part responsible for the seepage, but whether there was a sufficient basis for the jury to conclude that Cities was culpable.

due to the condition or use of said premises or the streets or roads on which they abut."

We find it unnecessary to decide whether this indemnity provision is enforcible under New York law when the landlord commits an intentional tort.[4] Cities is not simply a landlord who was negligent in failing to avert dangerous conditions on its premises. The jury found Cities liable for its intentional violation of its obligations to abate the pollution under the state court stipulation. Having assumed an affirmative obligation, outside the lease, to prevent oil seepage, appellant may not now insist that MGO make it whole, under a lease indemnification clause, for damages resulting from its own failure to discharge that obligation. We have no reason to think that, in the circumstances, the New York courts would permit a lessor to escape the direct consequences of its own intentional breach of a settlement agreement. See note 4, supra.

We also find no merit in Cities' contention that the trial court erred in denying Cities' motion to amend its pleadings at the close of trial to include a common-law claim for indemnification or contribution under

---

4. The district court dismissed Cities' third-party claim in part on the authority of McLean v. L. P. W. Realty, 507 F.2d 1032 (2d Cir. 1974), where we expressed doubt as to the conscionability and enforcibility under New York Gen. Oblig. Law § 5–321 of a lease indemnification clause. Appellant contends that McLean does not accurately reflect New York law after Hogeland v. Sibley, Lindsay & Curr Co., 42 N.Y.2d 153, 397 N.Y.S.2d 602, 366 N.E.2d 263 (1977), where the court construed § 5–321 to require indemnification of a shopping center landlord by a tenant for injuries sustained by one of the tenant's customers. Hogeland held that even where a landlord is himself negligent, he may nevertheless recover under an indemnity clause provided that the indemnity clause does not expressly except negligence from its coverage.

That Hogeland should be read, as appellant urges, to sustain the clause at issue in the instant case is by no means clear, however. The Court of Appeals in Hogeland was careful to leave open the possibility that adhesion principles might be applicable in a commercial lease setting, and also noted specifically that there was no suggestion of overreaching or disparity in relative bargaining positions either in the action before it or in Levine v. Shell Oil

Dole v. Dow Chemical Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972). From the outset, Cities' trial strategy was to argue that it bore no responsibility whatever for seepage from the Monticello terminal. It, accordingly, made no claim for contribution, which would have posited a joint liability. Since Cities had elected for tactical reasons not to acknowledge the slightest culpability, the district court did not abuse its discretion in declining to accept a proposed Dole v. Dow Chemical instruction, proffered just two hours before the jury was to be charged, under which the jury could apportion liability between Cities and MGO.

### III

Appellant further submits that the plaintiff failed to establish damages. Cities argues here, as it did at trial, that Doralee Estates failed to prove how much of its claimed diminution in property value was attributable to seepage from the MGO plant which occurred after the effective date of the release executed by Doralee pursuant to the April 1972 state court settlement.[5] In Cities' view, Doralee was obli-

---

Co., 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971), where the court also sustained a lease indemnification provision. A somewhat different negotiating context is presented here, since MGO was a distributor of Cities, whose net worth was stipulated to be $1.336 billion, and the lease, though it had some negotiated changes, was on a printed form containing Cities' name and logo. We need not plunge into the thicket of New York law since Cities had obligated itself by independent stipulation for the benefit of the plaintiff to undertake to remedy the conditions on the premises which gave rise to the liability.

5. It is common ground that the plaintiff cannot recover for damage caused before the effective date of the release. Cities takes the position that October 24, 1972, the date appearing on the face of the release, was its effective date. Doralee argued at trial that the October date on the release was a clerical error and that its real effective date was April 25, 1972. The jury so found pursuant to instructions indicating that the date was a contested issue. We think the trial court was correct in submitting this issue to the jury and we see no reason to disturb the jury's determination.

gated to establish that discharge from the MGO plant which occurred before the 1972 release was in no part responsible for its claimed damages. Cities further suggests that other pollutants such as sewage, discharge from another petroleum plant, and automobile exhaust and leakage contributed to Doralee's damages.

We think that Cities overstates plaintiff's burden. When a defendant's tortious acts are of a nature which preclude precise ascertainment of damages, the jury may make "a just and reasonable estimate of the damage based on relevant data and render its verdict accordingly." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). *Lee v. Seagram*, 552 F.2d 447, 455 (2d Cir. 1977); *National Conversion Corp. v. Cedar Bldg.*, 23 N.Y.2d 621, 630, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969); *Nordone v. Mondo*, 269 App.Div. 896, 56 N.Y.S.2d 606 (4th Dept. 1945).

A review of the record convinces us that there was, in fact, little to support Cities' contention of independent causes of pollution. The jury could reasonably have found that oil seepage occurring after the 1972 release caused the conditions for which Doralee sought compensation, namely, lost rents and an accumulation of oil saturated materials in its lake. This case is thus distinguishable from those cited by appellant, *Chipman v. Palmer*, 77 N.Y. 51 (1879) and *Ponderosa Pines, Inc. v. Queens Farm Dairy, Inc.*, 48 A.D.2d 760, 368 N.Y.S.2d 358 (4th Dept. 1975), where the records were devoid of proof of the respective culpability of multiple tortfeasors. More to the point is *Burt Olney Canning Co. v. State of New York*, 230 N.Y. 351, 356, 130 N.E. 574, 576 (1921), where Judge Cardozo observed in response to an argument similar to that pressed by Cities here:

> "Recovery would not fail altogether because the division of the consequences might be uncertain and approximate. . . . The law is generous in the license that it accords to the triers of the facts when seeking to segregate the damages. . . ." [Citations omitted.]

## IV

With respect to the punitive damage award, Cities maintains that Judge Owen should not have submitted the question to the jury because plaintiff failed to establish that malicious conduct was authorized or ratified by its officers or directors. It contends that punitive damages may not be imposed if the echelon of responsibility for authorization or ratification is any lower. Appellant takes exception to Judge Owen's charge to the jury that "[y]ou may not impose punitive damages on a corporation, however, unless a responsible management official or officials of the company, or the relevant division, either authorized, participated in, consented to, or after discovery ratified the conduct giving rise to such damages." Relying on *Koufakis v. Carvel*, 425 F.2d 892 (2d Cir. 1970), and *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967), Cities contends that knowledge on the part of corporate officers or directors is a prerequisite to the imposition of punitive damages. We assume that New York law governs the propriety of an award of punitive damages. *Givens v. W. T. Grant Co.*, 457 F.2d 612, 614 (2d Cir.), *vacated on other grounds*, 409 U.S. 56, 93 S.Ct. 451, 34 L.Ed.2d 266, *modified*, 472 F.2d 1039 (2d Cir. 1972); 1A Moore, *Federal Practice* ¶ 0.310 (1974 ed.).

Though some language in *Koufakis v. Carvel, supra*, may be supportive of appellant's argument, we do not believe that the decision forecloses a holding that punitive damages were properly assessed in this case.

Though in *Roginsky v. Richardson-Merrell, Inc., supra*, we did not have to decide "whether, under New York law, the acts of inferior supervisory employees [inferior to divisional vice-presidents] would otherwise be deemed the acts of the corporation for purposes of assessing punitive damages," 378 F.2d at 842, n.17, we did note that "New York adheres to the 'complicity rule' holding the corporate master liable for punitive damages 'only when superior officers either order, participate in, or ratify outra-

geous conduct'" citing Morris, *Punitive Damages in Personal Injury Cases*, 21 Ohio St.L.J. 216, 221 (1960). *See* 378 F.2d at 842. In *Williams v. City of New York*, 508 F.2d 356, 361 (2d Cir. 1974), we said that a plaintiff "must show that those persons in a position of authority . . . in some way authorized, ratified or fostered the acts complained of."

The test of who is a "superior officer" or a "person in authority" to bind the corporate entity to participation or ratification cannot be rigid. We have mentioned with approval an observation of Professor Morris that a crucial factor is whether "the case calls for institutional correction not likely to be forthcoming without a punitive damage award." *Roginsky, supra*, 378 F.2d 842, n.18, citing Morris, *supra*, at 221. The question is whether the act or ratification is done by a person of such responsibility as to arouse the "institutional conscience." *Id.* The test is whether the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage. To hold that punitive damages may not be imposed unless there is participation in the tortfeasing decision by the highest corporate executives is unrealistic given the size of giant corporations like appellant whose operations are so far-flung. *See General Motors Acceptance Corporation v. Froelich*, 106 U.S.App. D.C. 357, 359, 273 F.2d 92, 94 (1959).[6] It is true that stockholders ultimately bear the cost of liability, but those who have been given authority to avert environmental damage should be given some incentive to do so. "Smart money" is the traditional way, and the type of modern tort represent-

ed here is a fair field for punitive damages, carefully restrained by practical considerations, such as the number of persons affected and the consequent unbearable burden that might be imposed by a multiplication of punitive damages.

Here there can be no doubt that responsible management officials were fully cognizant of the pollution emanating from the Monticello terminal. Langbein, Cities' regional maintenance manager, testified that he was aware of the seepage and of a pollution citation issued in April of 1973 by the New York Department of Environmental Conservation. The general counsel for Cities, in its home office in Tulsa, authorized the April 1972 state court settlement and was apprised by Langbein of the ongoing pollution at the Monticello terminal. Given this evidence of knowledge and inaction on the part of responsible management officials, we do not find error in the submission of the punitive damages question to the jury.

■ Nor are we inclined to disturb the jury's assessment of those damages. Remittitur, although reconcilable with the Seventh Amendment,[7] is an expedient to be employed with circumspection. Since punitive damages by their nature do not admit of precise determination, their evaluation is properly within the discretionary province of the jury, and will be overturned only if "shockingly" or "grossly" excessive. *Faulk v. Aware, Inc.*, 19 A.D.2d 464, 470, 244 N.Y. S.2d 259 (1st Dept. 1963), *aff'd*, 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778, *modified*, 14 N.Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372 (1964), *cert. denied*, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965). *See Lanfranconi v. Tidewater Oil Co.*, 376 F.2d

---

**6.** In New York it has been held that a jury may assess punitive damages against a corporation even though the tortious act was not authorized or ratified by a director or an officer. *See, e. g., Gill v. Montgomery Ward & Co.*, 284 App.Div. 36, 40, 129 N.Y.S.2d 288 (3d Dept. 1954); *Corrigan v. Bobbs-Merrill Co.*, 228 N.Y. 58, 71–72, 126 N.E. 260 (1920); *Rose v. Imperial Engine Co.*, 127 App.Div. 885, 112 N.Y.S. 8 (4th Dept. 1908), *aff'd*, 195 N.Y. 515, 88 N.E. 1130 (1909). *See generally*, Prosser, *Law of*

*Torts*, 11–12, 464 (4th ed. 1971); Morris, *Punitive Damages in Tort Cases*, 44 Harv.L.Rev. 1173, 1200–03, 1209 (1931); *Note, Exemplary Damages in the Law of Torts*, 70 Harv.L.Rev. 517, 524–26 (1957). *But cf., Note, The Assessment of Punitive Damages Against an Entrepreneur for the Malicious Torts of His Employees*, 70 Yale L.J. 1296, 1306–09 (1961).

**7.** For discussion, see 6A Moore, *Federal Practice* ¶ 59.05[3] (1974 ed.).

91 (2d Cir.), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Stevenson v. Hearst Consol. Publications, Inc.*, 214 F.2d 902, 911 (2d Cir.), *cert. denied*, 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688 (1954); *Szekely v. Eagle Lion Films, Inc.*, 140 F.Supp. 843, 850 (S.D.N.Y.1956), *aff'd*, 242 F.2d 266, 269 (2d Cir.), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). We cannot so characterize the $200,000 award made here.

The jury could reasonably have found that, for a substantial interval, responsible officials of Cities elected to ignore their obligations under the April 1972 stipulation and the New York Environmental Act.[8] In view of the resources Cities could have brought to bear to abate the pollution in Monticello and the deliberate decision by responsible persons not to do so, the award does not appear manifestly excessive.[9] Exemplary damages are intended to inject an additional factor into the cost-benefit calculations of companies who might otherwise find it fiscally prudent to disregard the threat of liability. To function effectively, the award must be "of sufficient substance to 'smart' . . . the offender." *Reynolds v. Pegler*, 123 F.Supp. 36, 41 (S.D.N.Y. 1954), *aff'd*, 223 F.2d 429 (2d Cir.), *cert.*

*denied*, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).[10]

V

Relying on *John Long Trucking, Inc. v. Greear*, 421 F.2d 125 (10th Cir. 1970), Cities submits that the trial court committed prejudicial error in not granting three peremptory challenges each to Cities and MGO, and in concluding that Cities waived the challenge over which it had sole control. As the original third-party complaint was framed, Cities and MGO did not assume adverse positions on any jury issue. Rather, their hostile interest concerned a question of law based on Cities' alleged contractual right of indemnification. The trial judge was well within his discretion under 28 U.S.C. § 1870[11] to allot Cities and MGO one peremptory challenge each to be exercised individually and three peremptory challenges to be exercised jointly, since the third-party defendant was in the same position as the defendant in resisting the claim of the plaintiff. *See Carey v. Lykes Brothers Steamship Company*, 455 F.2d 1192, 1194 (5th Cir. 1972); *Moore v. South African Marine Corp. v. Gulf Stevedore Corp.*, 469 F.2d 280, 281 (5th Cir. 1972).

8. Judge Owen instructed the jury that an intentional violation of the state's environmental laws might be considered in determining whether punitive damages were appropriate. New York Environmental Conservation Law § 17–0501 provides:

"It shall be unlawful for any person, directly or indirectly, to throw, drain, run or otherwise discharge into such waters organic or inorganic matter that shall cause or contribute to a condition in contravention of the standards adopted by the Department pursuant to Section 17–0301."

9. Though Cities offered to stipulate that it could meet any award, the judge could not compel acceptance of the stipulation. Judge Owen properly followed New York law in admitting into evidence the stipulation concerning Cities' net worth only after the jury determined that punitive damages were appropriate. *Rupert v. Sellers*, 48 A.D.2d 265, 269–72, 368 N.Y.S.2d 904 (App.Div.1975).

10. We note in passing that New York State Environmental Conservation Law § 71–1933, as it read in 1973, provided a fine of not less than

$500 nor more than $2500 per violation, and that "[e]ach day upon which such violation occurs shall constitute a separate violation." The jury could have found that Cities was in possession of the premises from the period after MGO ceased operations in February of 1973 through the dismantling of the terminal in mid-summer of 1973. There was evidence that substantial seepage occurred during this interval and that Cities deliberately did not appear at an Environmental Conservation Complaint hearing in April of 1973 because it feared its presence would escalate the fine.

11. 28 U.S.C. § 1870 provides:

"In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

"All challenges for cause or favor, whether to the array or panel or to individual jurors, shall be determined by the court."

■ On the question of waiver, we find no abuse of discretion in the trial court's distribution of challenges so that Cities was required to exercise its single peremptory challenge in a given round or waive it altogether.

■ Finally, the district court did not err in submitting to the jury plaintiff's claim that the stipulation had been breached by appellant. Plaintiff's eighth cause of action alleged that Cities had violated the New York state court stipulation. As originally filed, the complaint requested rescission of the stipulation agreement. The plaintiff moved at trial to amend its pleadings to seek damages for breach of the agreement. The district court was within its proper scope of discretion under Rule 15(b) in granting the motion of Doralee to conform its pleadings to the proof. The damages resulting from the breach of the stipulation depended upon the same facts that would support rescission, and were precisely the same as those flowing from the claims for relief for nuisance, trespass and negligence.

We have carefully examined appellant's other claims of error and find them without merit.

The judgment is affirmed.