**In the Matter of SAPPHIRE STEAM-SHIP LINES, INC., Bankrupt.**
**No. 67-B-252.**

United States District Court,
S. D. New York.
Feb. 2, 1972.

Louis P. Rosenberg, Brooklyn, N. Y., for the Trustee by Alfred A. Rosenberg, Brooklyn, N. Y., of counsel.

Joseph L. Alioto, Sp. Counsel to Trustee, San Francisco, Cal., by Joseph L. Alioto, Lawrence Alioto, San Francisco, Cal., and Robert E. Scher, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for E. Bergendahl Co., Inc. (New York and Philadelphia) by Terence H. Benbow, New York City, of counsel.

Sullivan & Cromwell, New York City, for intervenor United States Lines, Inc. by Roy H. Steyer, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for intervenor Waterman Steamship Corp. by John K. Mallory, Jr., Washington, D. C., of counsel.

Arnold & Porter, Washington, D. C., for intervenors American Export Isbrandtsen Lines, Inc., Bloomfield Steamship Company, Global Bulk Transport, Inc., Isthmian Lines, Inc., Lykes Bros. Steamship Co., Inc. and States Marine Lines, Inc. by Stuart J. Land, Melvin Spaeth and Irvin Nathan, Washington, D. C., of counsel.

Satterlee & Stephens, New York City, for intervenor Moore-McCormack Lines, Inc. by James F. Dwyer, New York City, of counsel.

Bergson, Borkland, Margolis & Adler, Washington, D. C., for "Non Trade" Shipping Lines by Daniel H. Margolis, Washington, D. C., of counsel, and Barrett, Knapp, Smith & Schapiro, New York City by Whitman Knapp, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S. D. New York, New York City, for the United States by Alan B. Morrison, New York City, of counsel.

Foley, Hoag & Eliot, Boston, Mass., for intervenor Farrell Lines, Inc. by Andrew J. McElaney, Jr., Boston, Mass., of counsel.

LASKER, District Judge.

This is a petition by the trustee in bankruptcy to review and set aside the Referee's disapproval of a compromise of the trustee's antitrust claim against the former competitors of the bankrupt. In addition, the competitors move to intervene in the review proceedings. The facts are undisputed; the conclusions to be drawn from them are not.

The antitrust case, the major asset of the bankrupt estate, was filed in the summer of 1966 in the United States District Court for the District of Columbia.[1] In March 1967, Sapphire Steamship Lines, Inc. ("Sapphire") filed a petition in bankruptcy. The defendants are AGAFBO (the acronym for Atlantic & Gulf American Flag Berth Operators, a conference of steamship companies) and the 17 member lines of AGAFBO. Each defendant except the conference was a competitor of the plaintiff. The complaint alleges that the defendants conspired to put Sapphire out of business in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 810 of the Merchant Marine Act, 46 U.S.C. § 1227, and that they in fact succeeded in doing so. Damages are claimed in the amount of approximately $4 million dollars trebled. The defendants have denied the allegations.

Sapphire was incorporated in February 1965 with a capital of $750,000. It engaged primarily in ocean transportation between the Atlantic Coast and the Gulf on the one hand and Northern Europe on the other. Its vessels (it controlled five at one time and owned three) carried general military cargo, military

---

1. Sapphire S.S. Lines, Inc. v. Atlantic & Gulf American Flag Berth Operators, Civ. 2130-66.

household goods, vehicles, ammunition, and other articles of commerce shipped by government service organizations, including the Military Sea Transport Service (MSTS).

It is undisputed that from the end of World War II until Sapphire's entry into the field the defendants monopolized or at least controlled the major share of MSTS business between the Eastern Gulf Coast and Northern Europe. Rates apparently were fixed by agreement among the defendants with MSTS approval, cargo being allocated by MSTS among the defendants in proportion to their respective sailings.

Sapphire's principals, who had previously been engaged in the trucking industry and who were new to the shipping business, concluded that they could make a profit at rates considerably lower than those being charged by the defendants, and filed rates for key government cargo at approximately 50% lower than defendants'.

The defendants met Sapphire's attack with an unrestrained counterattack which has been authoritatively determined to have put Sapphire out of business. (See Safir v. Gibson, 432 F.2d 137 (2d Cir. 1970), for a resume of proceedings brought against Sapphire's competitors before the Federal Maritime Commission.)

The original complaint alleged a variety of predatory acts other than predatory pricing. After the complaint had been brought the Federal Maritime Commission in Rates on U. S. Government Cargoes, No. 65–13, found defendants' rates to have been predatory, outside the scope of governmental immunity, and established for the purpose of putting plaintiff out of business. The complaint was thereupon amended to add predatory pricing to the other means alleged to have constituted the conspiracy to drive plaintiff out of business.

Sometime in 1969, defendants made a first offer to settle the case and related cases for $825,000. The offer was rejected by the trustee on advice of counsel. After several months of further negotiation, the present offer to settle the actions for $1,600,000 was made. The trustee, again on advice of counsel, accepted the offer subject to the approval of the Referee. After a hearing in which all interested parties participated, the Referee by opinion dated September 21, 1970, approved the settlement. His conclusion was based on the following factors:

1. The plaintiff's case as to liability of the defendants was very strong.

2. The case as to proof of damages was seriously deficient because certain basic accounting records of the bankrupt were missing, the original complaint did not allege predatory rate fixing, the bankrupt's principal, Marshall Safir, had been uncooperative as a witness for plaintiff, and the bankrupt's president, Arnold Weissberger, could probably not testify at trial because of illness. The Referee characterized the view of those opposing the compromise that these deficiencies could be overcome as "the purest of speculation."

The Referee recognized that, after paying the fee of special counsel and administrative costs and expenses, the balance would go to the government on a priority claim and the general creditors would be paid nothing. He therefore discounted their enthusiasm to continue the suit, pointing out that they had nothing to lose by proceeding and everything to gain, whereas the continuance of the suit would be costly to the other parties.

On October 8, 1970, the United States, E. Bergendahl Co., Inc. (New York), and E. Bergendahl Co., Inc. (Philadelphia) jointly moved the Referee for reconsideration of his order and for a rehearing on the proposed compromise.

On reargument, the moving parties submitted evidence showing that two Internal Revenue Agents (who were highly qualified accountants), assisted by Erling Thompsen, chief accounting officer for Sapphire, and Max Staves, Chief, Audits Branch, U. S. Department of

Commerce, Maritime Administration, had examined the books and records of the bankrupt, as well as certain so-called "Cargo Lifted Reports," and that, on the basis of these records, these experts believed it possible to compute the total revenue realized from each of Sapphire's voyages. The exhibits attached to the moving papers showed the revenue results for the 48 voyages commenced by Sapphire between March 1, 1965 (the date Sapphire became active in the business) and October 1, 1966 (the date competitive bidding went into effect). From the exhibits it appeared that the average revenue for each of the first 35 voyages during the period the alleged illegal rates were in effect was approximately $153,000, whereas the average for the 13 voyages after March 1, 1966, when the illegal rates were not in effect, was $209,649. The Referee observed:

"If the difference of $57,000 per voyage represents a 'loss' in revenue, then a projection back to the first thirty-five voyages could indicate a total loss of revenue of some $2 million.

"It may not be, as movants argue, an 'inescapable conclusion' from the aforesaid revenue study that bankrupt suffered a $2 million loss as a result of the illegal rates, but it certainly is true that properly presented, a jury may very well draw that conclusion."

The Referee found that the material available on the motion for reconsideration, "now paints an entirely different picture from that presented when the compromise first came on for hearing . . .," emphasizing that there were "promising new witnesses" and records available to the trustee which substantially strengthened the bankrupt's case on damages—the only prior element of weakness. The Referee pointed out that, in contrast to the situation which existed at the time of his original order approving the compromise, it now appeared that the trustee had available to him the following witnesses and records supporting the bankrupt's damage case:

1. Erling Thompsen, a certified public accountant and former treasurer and chief accounting officer of the bankrupt, who would testify that discriminatory practices of the defendants caused the bankrupt to go out of business. Thompsen had located many of bankrupt's books and expressed the view that some missing records could be reconstructed. He was willing to supervise the operation if requested. He had also located work sheets of the accountants for the bankrupt which might be of further assistance. It was his opinion that the damages sustained by the bankrupt exceeded $3 million.

2. Arnold Weissberger, previously believed ill, had stated by affidavit that he had recovered and was now able and willing to testify, and that he had in his possession documents containing accounting data relevant to damages. In his opinion damages were at least $3.5 million.[2]

3. Marshall P. Safir, the bankrupt's principal and chairman of the Board, previously said to be antagonistic and unavailable, now appeared to oppose the settlement strongly and to be willing to testify.

4. Testimony of the Internal Revenue Agents referred to above, characterized by the Referee as "promising new witnesses" on the trustee's behalf.

Finally, the Referee pointed out that, since the government had a large stake in the ultimate result of the case, he assumed that it would cooperate with special counsel in preparing for trial and make available to him the witnesses and records referred to above.

On the basis of the changed picture presented on the motion for reconsideration, and his view that a jury might well draw the conclusion that the bankrupt had suffered a two million dollar loss as a result of the defendants' acts (which would be trebled to $6 million

---

2. Weissberger's estimate of damages was presumably before trebling.

under the Act), the Referee reversed his prior decision and disapproved the compromise and settlement.

Although the trustee argued then, as now, that the settlement was in the interest of the bankrupt estate, he deferred to the Referee's disapproval and originally elected not to petition for review of that decision. Thereafter the defendants in the antitrust action made two motions before the trial judge. The first was for a ruling that the government's study as to the estimated loss of revenue allegedly caused by defendants' conduct was not evidence admissible in the antitrust case. That motion was granted, the Court commenting, in the course of its oral ruling, that

" . . . in its present form the damage analysis should be excluded and it should be excluded on the basis of the fact that it is based entirely upon a showing of what the gross revenues were during the critical period and the rule of law [3] appears to be that for proof of damages in an anti-trust suit, the evidence must show loss of net income or net profits."

The second motion was for an order interpreting the parties' settlement agreement as requiring the trustee to seek review of the Referee's order in this Court and directing the trustee to do so. On June 9, 1971, the trial judge signed such an order, and this petition was filed shortly thereafter.

\* \* \*

■ Section 27 of the Bankruptcy Act provides for compromise of the bankrupt's claims against others in the following language (11 U.S.C. § 50):

"The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate."

A referee is included within the meaning of the term "the court." In Re Paley, 26 F.Supp. 952 (D.C.S.D.N.Y.1939).

On review of a referee's order approving or disapproving a compromise, the courts (including the courts of this Circuit) universally hold that such action is "a discretionary order which can be reversed only upon a clear showing of an abuse of discretion." Connecticut Ry. & Lighting Co. v. New York, N. H. & H. R. Co., 190 F.2d 305 (2d Cir. 1951); In Re Prudence Co., 98 F.2d 559 (2d Cir. 1938), and cases cited in both. See also Florida Trailer and Equipment Co. v. Deal, 284 F.2d 567 (5th Cir. 1960); In Re California Associated Products Co., 183 F.2d 946 (9th Cir. 1950); and In Re Paley, supra.

---

3. The court referred to the case of Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), as supporting his ruling.

The trustee, and at argument the major (trade) defendants, contended vigorously that the trial court's ruling pulled the rug out from under the Referee's determination that substantial damages could now be established by the bankrupt. They asserted that the Referee failed to comprehend, or at least to consider, the significance of the court's determination. Their argument is not valid. In his decision on motion for reconsideration of May 24, 1971, the Referee specifically analyzes the trial court's order in the following decisive language:

"The trustee makes much of the fact that the judge in the District Court for the District of Columbia issued an order that the loss of revenue study would not be admitted in evidence at the anti-trust trial 'in its present form.' But my decision was not grounded upon the assumption that it would be. The study was meant only to demonstrate to me that substantial damage could be established and that therefore the compromise ought not to be approved. I assumed, and still assume, that at the anti-trust trial competent witnesses, will be forthcoming, with the Government's assistance, who would through their testimony establish the damages indicated in the loss of revenue study."

Of course, the antitrust court's decision does not purport to indicate that proof of gross revenue loss would be irrelevant, nor that, when properly supplemented (by proof of plaintiff's costs of doing business) to establish damage, the result would not be admissible.

The most authoritative text writer on bankruptcy states:

"The decision of the referee in bankruptcy as to the approval or disapproval of a compromise agreement rests upon his sound discretion. Such a decision is reviewable by the district judge, but will normally not be set aside except where there is a plain error or abuse of discretion." 2 Collier on Bankruptcy, 14th Ed., ¶ 27.05, p. 1097.

and Judge Brown has pointed out in *Florida Trailer*, supra, that there are distinctions between an ordinary appeal and the review of a referee's decision:

"This appeal really presents the question whether there was such an abuse of discretion in the Referee's approval of a proposed settlement that the District Court erred in not setting it aside. We emphasize *really* because the Objecting Creditor (now appellant) in the hearing before the Referee, on the petition of review in the District Court and again here in briefs and arguments, persists in treating the matter as though this were an appeal from a decision on the intrinsic merits in an initial adversary proceeding. The two are quite different." *Id.*, at 568.

■ On this petition, therefore, our function is not to review the "intrinsic merits" of an ordinary adversary proceeding, but to determine only whether there is plain error or a clear showing that the Referee has abused his discretion.

The trustee contends that the Referee has abused his discretion in disapproving the compromise. While not failing to emphasize the strength of Sapphire's claims (particularly in view of the findings of the Federal Maritime Commission that the defendants' actions put Sapphire out of business), he nevertheless contends that the Referee failed to take into account a number of factors so fundamental in importance that the cumulative failure constituted an abuse. In particular, the trustee argues that the

Referee accepted the government's estimate of Sapphire's loss of revenue at its face value and equated the loss of revenue with loss of profits, a mistake in law. The trustee claims that the Referee's decision hinges on his findings of a possible $2 million loss in revenue (in turn based on the government's computation of a loss per voyage of $57,000) and that this figure is clearly erroneous since it fails to deduct from these gross revenues Sapphire's cost of doing business and to consider whether the post-conspiracy figures are comparable to those for the conspiracy period. He asserts that dock charges and inflationary labor costs, among others, would reduce the hypothetical $57,000 per voyage loss to between $20,000 and $30,000, and that if this were the proper factor for loss per voyage, the total provable damages (before trebling) would range from $500,000 to $800,000 rather than $2 million.

The trustee contends that the Referee failed to take into consideration other weaknesses in the case: that reconstructed records (assuming, arguendo, that Sapphire's records can be reconstructed) are less dependable than original records; that the proposed new witnesses for Sapphire have in some cases been hostile to the trustee or have in testimony in prior proceedings made admissions that Sapphire's bankruptcy was not caused by defendants' predatory rate fixing; and that the original complaint did not in fact allege predatory rate fixing as a cause of action.

Vigorous as these arguments may be, and however persuasively they might be presented if this were a proceeding relating to the "intrinsic merits" in an initial adversary proceeding, they are inadequate to establish plain error or a clear showing of abuse of the Referee's discretion. As to the weight to be attached to the government's estimates of revenue losses, the Referee did not assume that the movants for reargument had mathematically demonstrated damages in the amount of $57,000 per voyage. Indeed, he recognized that "[i]t

may not be, as movants argue, an 'inescapable conclusion' from the aforesaid revenue study that bankrupt suffered a $2 million loss as a result of the illegal rates," although he did stress that "properly presented, the jury may very well draw that conclusion." [4]

■ The other contentions of the trustee were all brought sharply to the Referee's attention, and he was thoroughly aware of them in rendering his decision. It was not an abuse of discretion on his part to differ from the trustee in concluding that reconstructed records could support the claim, that previously hostile witnesses were no longer so, and that prior statements by some witnesses that Sapphire's losses had not been caused by defendants' predatory rates could be reconciled with their trial testimony on the basis of new information and further study of the facts.

Nor is there any validity to the trustee's claim that the Referee was unduly influenced by the fact that if the settlement agreement were approved the general creditors would receive nothing. In his earlier decision approving the settlement the Referee clearly indicated that he did not regard the creditors' failure to receive any payment as a controlling factor.

The opinion in Drexel v. Loomis, 35 F.2d 800 (8th Cir. 1929), articulated a formula for acting on a compromise in terms which have generally been followed by the courts:

"In determining the advisability of accepting an offer of compromise, many considerations are addressed to the sound discretion of the referee and chancellor, among them: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

The review of this record, including the proceedings on the original motion to approve the compromise, the motion to reconsider, and the reconsideration itself, demonstrates that the Referee here, nationally recognized as one of the most thoughtful and experienced referees in the country, gave due and intelligent con-

---

4. The reasonableness of the Referee's view may be supported by the very case on which the trial court relied in determining that the creditors' gross revenue damage study is inadmissible "in its present form": Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). In that antitrust case plaintiff attempted to establish damages by showing a comparison of its "receipts," less cost of film for a later period, with the corresponding receipts for an immediately preceding period. The Court of Appeals reversed the jury verdict for the plaintiff on the ground that the evidence of damage was insufficient. The Supreme Court reversed the Court of Appeals, holding that the loss of plaintiff's admission receipts was a fair measure of its damage. In reaching its conclusion, the Court stated (at 265, 66 S.Ct. at 580):
  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

and later, quoting Story Parchment Co. v. Paterson Co., 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544, observed:
  " 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights.

  " . . . The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage."
These observations appear pertinent here and support the Referee's analysis of the case at hand.

sideration to all of these factors. It was not an abuse of discretion on his part to disapprove the compromise, and the petition to review his order is denied.

Two matters remain for disposition:

■ The so-called non-trade defendants ask the court to approve the compromise settlement as to them, even if it is rejected as to the major (trade) defendants. The application appears premature, however, since the Referee has not specifically ruled on any such proposal. The record is totally inadequate, if not silent, on the merit or lack of merit of the proposed separate settlement with the non-trade defendants, and the attorney for two of them (Prudential Steamship Co. and Prudential-Grace Lines) agrees in a memorandum in support of the motion that "there may well be merit to the Government's position that the Referee should separately rule on the non-trade settlement before this Court deals with it as an independent matter." Under the circumstances, the motion of the non-trade defendants is denied, without prejudice to their right to move the Referee for separate approval of the proposed settlement between them and the trustee.

■ The major (trade) defendants [5] move to intervene as parties to this petition for review. At the argument on the petition, the court heard their counsel and permitted them to submit a brief on the merits of the petition, but expressly reserved decision as to whether further intervention would be permitted. The motion to intervene is denied. Although these defendants have a significant stake in a determination as to the propriety of the compromise, the trustee, represented by distinguished counsel, is fully capable of representing before this court (and the Court of Appeals should there be an appeal from this decision) the interests of all who support the proposed compromise.

The trustee's petition to review the decision of the Referee is denied; the non-trade defendants' motion to review the Referee's decision as to those defendants alone is denied, without prejudice to the right of such defendants to move the Referee for approval of their agreement of compromise, and the motion of the major (trade) defendants to intervene is denied.

It is so ordered.

---

5. United States Lines, Inc.; Waterman Steamship Corporation; American Export Isbrandtsen Lines, Inc.; Bloomfield Steamship Company; Global Bulk Transport, Inc.; Isthmian Lines, Inc.; Lykes Bros. Steamship Co., Inc.; States Marine Lines, Inc., and Moore-McCormack Lines, Inc.