John PIRRE, Plaintiff,

v.

PRINTING DEVELOPMENTS, INC. and
Time Incorporated, Defendants.

No. 75 Civ. 3793.

United States District Court,
S. D. New York.

March 16, 1979.

Silver, Golub & Sandak, Stamford, Conn., for plaintiff; by David S. Golub, Stamford, Conn., of counsel.

Sharfman, Shanman & Poret, New York City, for defendants; by Richard Sharfman, Charles I. Poret, New York City, of counsel.

## OPINION

WHITMAN KNAPP, District Judge.

The complaint in this diversity lawsuit originally alleged claims for wrongful discharge, slander and libel against Printing Developments, Inc. ("PDI"), plaintiff's former employer, and Time Incorporated, of which PDI was a wholly owned subsidiary. (See *Pirre v. Printing Developments, Inc.* (S.D.N.Y.1977) 432 F.Supp. 840). Only two claims of libel were ultimately submitted to the jury, which returned a verdict dismissing the complaint against Time Incorporated but awarding damages totalling $445,000 against PDI.

Defendant PDI now attacks that verdict. It moves for a judgment notwithstanding the verdict on several grounds: (1) that there was no publication as a matter of law; (2) that defendant's conceded privilege in speaking of its employee was not overcome by competent evidence; and (3) that the doctrine of respondeat superior was inapplicable. Defendant also moves for a new trial on grounds that (1) we erroneously charged the jury on the nature of plaintiff's burden of proof with respect to malice, (2) that admission of some testimony, including testimony regarding the alleged slander, was prejudicial, (3) that the verdict was against the weight of the evidence, and (4) that the size of the damage award indicates that the jury was moved by prejudice or

partiality. Finally, defendant asks that certain elements of damage be eliminated as a matter of law, and that all be reduced as excessive. It is our conclusion that certain elements of damage must be eliminated and others reduced but that defendant's motions should in all other respects be denied. We shall—for the sake of convenience—first discuss questions concerning damages and then take up the legal considerations posed by the motions for judgment notwithstanding the verdict and for a new trial.

### The Facts

The legal and discretionary questions presented by these motions can intelligently be discussed only against the background of a comprehensive review of the facts. Moreover, in order properly to appraise the jury's action in this case it is necessary to contrast the facts which—based on the evidence before us—we believe actually to have existed and the version of those facts as they appeared to the defendants and were by them presented to the jury.

(a) *The facts which—on the basis of the evidence before us—we deem actually to have existed*

Defendant Printing Development, Inc. ("PDI")—a wholly owned subsidiary of Time Incorporated—was, as its name implies, engaged in developing and selling specialized equipment useful in the printing trades. From about 1955 until about 1973 it had had great success in marketing a product called a "scanner", an instrument used in the reproduction of color photography. PDI's success, during the years mentioned, was due to the fact that the excellence of its product gave it a practical monopoly of the market.

Although PDI's engineers were responsible for the design of the product, they played no part in its manufacture, responsibility for which had been contracted out to a concern known as the Wendon Company. The relationship between PDI and Wendon was most informal. When PDI wished to create a new product or modify an old one it would not submit detailed plans and specifications to Wendon, but would provide Wendon with preliminary sketches and the details would be worked out as the product was manufactured.

Success of this informal ad hoc process of manufacture was primarily made possible by the skill and perspicacity of plaintiff John Pirre, who had the responsibility of acting as liaison between PDI and Wendon. He interpreted his employer's needs and desires to Wendon and kept the former advised of any problems that might be confronting the latter. Pirre was practically a mechanical and engineering genius. In addition he was—and is—a wholly engaging human being. In short, he was ideally suited to managing the informal relationship that existed between PDI and Wendon. But there was an Achilles' heel in his character. He was an extraordinarily sensitive man who had to do things in his own way, and was wholly incapable of conforming to any sort of structured discipline. Illustrative of this characteristic is the circumstance that during World War II when he was in the Navy he found discipline wholly intolerable, developed a serious ulcer and had to be released from service on a medical discharge.

A function of Pirre's sensitivity was that he was extremely allergic to criticism and—if he were to function effectively—had constantly to be praised by his superiors.

PDI's halcyon days came to an end when its competitors began to develop comparable products, and the handsome profits flowing from the scanner operation began to given way to losses. Time Incorporated, the parent company, reacted to this situation by putting in a new management team. For present purposes, the principal participants in this team, in order of their scale of authority, were Robert Sorenson, Brian Chapman and Alan Hahn.

For purposes of this lawsuit, perhaps the most important of these was Brian Chapman. He was a highly competent administrator, and like Pirre, had an engaging personality. But he, too, had an Achilles' heel which assumed significant proportions in

the peculiar circumstances presented by this lawsuit. He had a tendency when under stress to confide in persons whom he thought of as friends. The recipients of his confidence did not always respect the confidentiality, and sometimes misunderstood his meaning.

So far as here relevant, the principal decisions made by new management were: (a) to tighten up procedures and substitute a more structured discipline for the old informality; and (b) to find an additional supplier for the scanner, thus eliminating the company's total dependence on Wendon.

Brian Chapman had been warned by Pirre's former superior, one Casanova, of Pirre's peculiar personality. Thus, in describing his original briefing by Casanova about Pirre, Chapman testified:

"And with regard to Mr. Pirre, he [Casanova] told me generally he could do a good job but did require an inordinate amount of praising and very careful couched terms to him correctly, et cetera, so as not to get him going, that if you did this you could get good work out of him."

However, recognizing his tremendous values—both technical and human—Chapman was determined to adjust himself to Pirre's personality. At first, he seemed to be succeeding.

According to the testimony of both men, Pirre and Chapman seemed to recognize each others' qualities and to consider each other as friends (in other words Pirre was a man in whom Chapman thought he could confide). The rift in the lute—inevitable in the circumstances—was precipitated by totally irrelevant events surrounding another PDI employee named Frank Labazzo.

One of new management's decisions had been to close down a building of which Labazzo had been superintendent. The building was not to be replaced and the company had no further use for Labazzo's services as building manager. However since Labazzo had been an old and valued employee—and was immensely popular with his fellows—management tried to salvage the situation by converting him into a purchasing agent. However, since Labazzo was not qualified for his new assignment, the attempted conversion proved a failure and in January of 1974 Sorenson directed Chapman to fire Labazzo. Chapman, foreseeing that the dismissal would create a storm of protest, argued that regardless of Labazzo's lack of productivity it was worth keeping him just to avoid trouble. Sorenson, reasoning that keeping the man in unproductive work was unfair to him in that it would ultimately unfit him for other employment, insisted that Chapman dismiss Labazzo. Chapman, having no choice, followed instructions.

As Chapman had foreseen, massive protests resulted. Moreover all the employees—and especially Pirre—thought the decision to fire had been Chapman's, regarded him as the hatchet man, and began to develop a hatred for him. A few days after ·the firing, Chapman wandered into Pirre's office and noticed a picture of Labazzo on the wall. Thinking he was with a friend and feeling under stress, he allowed himself to muse "I wonder who will be next". As he had just been overruled on a fairly important issue and as the new management didn't seem to be doing too well, he may well have been wondering whether or not he himself would be "next". But Pirre, who knew nothing of Chapman's inner turmoil and who had begun to hate him, interpreted the remark as a direct threat that Pirre would be Chapman's next victim. From that moment on the relationship between the two men worked itself out to its final denouement with the inevitability of Greek tragedy.

There was a fallout from the Labazzo incident which was to have future repercussions. In order to calm Labazzo's outraged fellow workers, PDI management took steps to reassure them that there would be no further precipitous firings. Among other things, they announced that Time's labor practices would henceforth be enforced at PDI, and specified that no employee could thereafter be fired for cause until he had received two warning letters. Such formality had been quite foreign to PDI practices, and apparently none of the new manage-

ment had had much experience with "warning letters".

So far as the evidence reveals, the next episode affecting Pirre occurred about three months later, when he was due one of his periodic evaluation reports. By that time Chapman had come to realize the impossibility of fitting Pirre into a structured operation and had begun to think about ways and means of terminating his employment. Having had no experience with "warning letters" he decided on a trial run and composed a memorandum to Sorenson (copy to Hahn) setting forth various ways Pirre would have to improve if he was to keep his job. As this memorandum was never intended to be seen by anyone but Sorenson and Hahn (it in fact was never seen by anyone else until it surfaced in the course of pre-trial discovery) and was not intended to perform any function other than practice in composition, Chapman did not discuss it with anyone and took no particular pains with respect to its accuracy.[1]

While Chapman had given up on him, Pirre's immediate superior, Alan Hahn, who was charged with making the evaluation, still had hope for him. Hahn accordingly prepared himself with great care for his evaluation interview with Pirre. He set forth in great detail Pirre's many undoubted accomplishments; and proceeded with great delicacy in areas where his work had met with criticism, trying to make tactful suggestions as to how Pirre could accommodate himself to the more structured situa-

tion in which he found himself. Pirre gladly lapped up the praise but flew into a rage at the slightest criticism, demanding to confront those who had found his work wanting. Hahn said he would try to arrange such a confrontation. However, when Hahn told Chapman of the problem, the latter concluded that such a confrontation would be futile and directed Hahn to forget the matter. Upon learning of Chapman's decision, Pirre became furious, accused Hahn of being Chapman's pawn and asserted that Hahn's original criticisms had not been his own but had been dictated by Chapman. When Hahn denied this, assuring Pirre that his criticism had been his own genuine efforts to help Pirre make necessary adjustments, Pirre—in the presence of other employees—called Hahn a liar. Upon learning of this episode, Chapman concluded that he had had enough, and composed and delivered to Pirre his first "warning letter." Not intended for general circulation, this letter was not carefully composed and contained a wholly unsupportable charge that Pirre had refused a direct command from his superiors.[2]

Following a protest by Pirre to PDI's president, Robert Edmondson, a meeting was arranged between Pirre, Hahn, Chapman and Sorenson. The meeting proved inconclusive. Pirre wanted a withdrawal of the warning letter. The PDI representatives, with the possible exception of Chapman, were anxious to pacify Pirre and get him back to work on a constructive basis.

1. All other statements in this section of the opinion are based upon what we believe to be fair interference from the facts before us, giving due regard to the demeanor of the witnesses through whom the facts were developed. However, this explanation of the Chapman-Sorenson memorandum is sheer speculation. Its only support lies in the unavailability of any other rational explanation. Sorenson discussed the memorandum with no one, and it was seen by no one but Sorenson and Hahn. These three men were in daily contact with each other and had no conceivable reason for communicating by formal memorandum.

2. The memorandum, in its entirety, asserted: "Your statements regarding Mr. Hahn's truthfulness, further complicated by your refusal to take action on the mounting of an

encoder on an MO unit has left me no choice but to issue you this warning.

If any further complaints are received from your supervisor with regard to your performance, attitude about your job or your dealings with your supervisor you will leave us no recourse other than terminating your employment with PDI. I would sincerely regret the necessity for taking this action. We have a great regard for your talents and abilities, and hope that we may continue to have them available to us. Because of this we are looking forward to an immediate and permanent improvement in your performance.

/s/ Brian M. Chapman
Brian M. Chapman
Director of Engineering"

Sorenson was not, however, prepared to require Chapman to withdraw the warning letter. Sorenson suggested a formula which seemed to him to satisfy everyone's legitimate concerns: Pirre would go back to work and develop a record meriting a raise in salary, which raise would have the effect of nullifying the warning letter. The meeting adjourned with everyone apparently happy with that formula. The next day, however, when Pirre began fully to grasp that the warning would not be formally withdrawn, he lodged outraged protests with all concerned. The record does not indicate how—if at all—this dispute was ever resolved.

About three months later—in June of 1974—Hahn was relieved of his responsibilities of supervising Pirre, which task was assigned to one Jack Andel. By this time PDI had found its second source of supply, a well-established firm called "Air Lock" which had developed a reputation for its work as subcontractor for various NASA air space projects. Needless to say, its work for NASA had not been on the informal ad hoc basis to which PDI was accustomed. Indeed, nothing in Air Lock's experience had prepared it for that type of relationship. Another complicating factor was that Air Lock had been selected by Chapman who—as PDI management was well aware—happened to be distantly related to one of its reasonably important employees.

Working under Andel, Pirre's responsibilities were enlarged to include liaison work with Air Lock. This arrangement did not work out well. As indicated, nothing in Air Lock's experience had prepared it for PDI's informal ways, and it soon found itself exasperating PDI management by failure to make deliveries on time. Pirre's personality was ill-suited to serving as a buffer between a dissatisfied customer and a frustrated supplier. So, instead of performing any useful liaison functions, he simply exacerbated the situation.

This generally untenable situation became explosive on October 17, 1974. Prior to that day Andel and Pirre had agreed that, in order to deal with Air Lock's critical arrearages, Pirre and his assistant Tom Melsopp should make themselves available at the Air Lock plant whenever its management should request their assistance; and Andel had advised Air Lock management of this decision. In the afternoon of October 17 an Air Lock official, acting on this advice from Andel, requested Melsopp to report to Air Lock the next morning. Pirre was outraged that any Air Lock employee would presume to give directions to *his* assistant, and countermanded the order. Apprized of this, Andel phoned Pirre and—after the two had engaged in a heated argument in the course of which Pirre used language Andel found to be offensive—peremptorily ordered Pirre to instruct Melsopp to report for work at Air Lock at the beginning of business on the following day. Pirre passed these instructions on to Melsopp but, hoping for another opportunity to dissuade Andel, varied them to the extent of telling Melsopp to stop off at the PDI office the next morning so that they could go together to Air Lock. The stopover at PDI proved more significant than anticipated. Pirre spent most of the morning arguing with Andel and others, and Melsopp did not get to Air Lock until the next morning.

This episode triggered a second or "final" warning letter, this time written by Andel. Like the first, it was clumsily drafted and contained statements difficult—if not impossible—fully to support. It ended on the following pious note: "It is deeply hoped that improvement in all the above areas will be evident in order to preclude termination." [3] Andel delivered the original to

---

**3.** The memorandum in its entirety was as follows:

"This memo is written as a final and lasting warning that your position with PDI will be terminated immediately should any actions similar to those explained below recur:

1. *Acts of Insubordination*—such as your complete disregard to report directly to work at Air-Lock on October 17, 1974, as instructed.
2. *Challenging Management Decisions*—such as instructing subordinates to do other than instructed by management.

Pirre, and made copies available to Chapman, Sorenson, Hahn, and Edmondson. Edmondson in turn sent copies to Robert Steed and Lucy Werner at Time Incorporated.[4]

Pirre quickly made this warning known to his fellow employees and it crystalized a revolt against Chapman which had apparently been brewing ever since the Labazzo incident. Without going into the details of this revolt, suffice it to say that it ended in a confrontation with management in which the employees insisted that Pirre's warning letter be withdrawn, and that Chapman be fired. Sorenson, who represented management in the dispute, ultimately decided to reject both demands and determined in his own mind that Pirre would have to be terminated. However, when he tried to communicate this to Pirre the latter had gone home. The next day Pirre reported sick, and never returned to work.

One step in this employee revolt had been an appeal by Pirre to his old friends at Wendon to come to the aid of the employees in their attempt to get rid of Chapman. Thinking that the selection of Air Lock as an alternate source had been Chapman's idea, Pirre tried to persuade the Wendon people that if Chapman could be got rid of they would soon be back in their old monopoly position as PDI's sole source of supply. The Wendon people, however, would have nothing to do with the matter, and nothing came of Pirre's attempt to get them involved.

PDI management did not learn of this episode until some time in December 1974, when it was reported by one of the Wendon people. After Sorenson had satisfied himself that the facts were substantially as just described, he decided that he was left with no alternative but Pirre's immediate termination. Sorenson's final "firing" letter was accordingly delivered to Pirre. This letter, copies of which were made available to Andel, Chapman and Edmondson, and Brienze of PDI, was—like its predecessors—clumsily written and contained accusations which could not be fully substantiated.

In summary, the worst that could be said of the errors contained in the two documents at issue (the second warning and the firing letter) was that they were the product of thoughtless and clumsy writing. In the real world the documents played no significant part in the termination of Pirre's employment, which had become inevitable the moment management decided to abandon the informal atmosphere in which Pirre had thrived and substitute a disciplined structure which he found impossible to tolerate.

If there had been any doubt of Pirre's total inability to survive management's decision to change the nature of the job, such doubt would have been eliminated by the testimony of Patrick Izzo, M.D., Pirre's personal physician. Dr. Izzo had first seen Pirre in 1967 when, in the course of treating

3. *Verbal abuse to other PDI Employees*—a prime example being your statement to the writer that he should "get down off your high horse and stop treating me like a hunk of rubber". Additionally, this abusive and improper action was taken by yourself while at another company's facility.

4. *Inability to Complete Assignments*—fully and in a timely manner. Excuses placing the onus on others at PDI or on PDI vendors, for not being able to complete assignments, will no longer be tolerated.

Your attitude toward PDI Management and management decisions bringing about detrimental feelings in others and reduced output in work assignments, by yourself and others, must be improved.

The quality and quantity of written reports on progress of PDI subcontracts must be im-

proved by seeking and discovering solutions to problems uncovered.

The regard for your talents and abilities has been made known to you on several occasions. These feelings are still evident in the writer and other Managers at PDI. It is deeply hoped that improvement in all the above areas will be evident in order to preclude termination.

> /s/ Jack Andel
> Jack Andel
> Assistant Business
> Manager"

4. Edmondson also testified at trial that he sent a memorandum regarding Pirre to Dr. Kirkham, Time Incorporated's Medical Director. Although Edmonson was uncertain in his testimony at trial of which memo was sent to Kirkham, he testified at deposition that this memo was the "final warning letter."

him for an unrelated ailment, he discovered that Pirre had an inactive ulcer—the one he had developed while under naval discipline—which was causing no current difficulties. By April of 1974, because of stressful conditions in Pirre's employment situation, the old ulcer had become so seriously reactivated as to require him to take a month's leave of absence from work. By November of 1974, there having been "no improvement" in his condition, Doctor Izzo concluded that Pirre had become completely disabled. By the time of trial however— Pirre in the meantime having been relieved of substantially all stress—his condition had improved sufficiently to permit selective employment.

In describing his prognosis for Pirre, Dr. Izzo testified that the ulcer would most certainly flair up again because of "John's personality, because of a situation he might get into in which there is stress." However the doctor could not rule out all possibility of future employability because (215):

> "In my opinion, I don't know if this man will ever be able to be gainfully employed full-time. That is the nearest I can say. I can't give an adequate prognosis on this. He might get into something he likes and be happy in his situation and he might be able to put in full time and even overwork a little.
>
> So it is a situation I can't tell, but I would like to keep him out of stressful situations."

In brief, Dr. Izzo's testimony established that while Pirre's personality ideally suited him for employment in the easygoing situation of an informal and prosperous small organization, it made it impossible for him to survive in the situation in which PDI found itself when new management was sent in to try to reverse a decline in the company's fortunes. In retrospect all that Chapman, Sorenson and the others could justly be blamed for is their failure to diagnose Pirre's problem in time to get him out of the situation before too much damage had been done. .

(b) *The picture as the defendants viewed it and as by them presented to the jury*

The foregoing constitutes a development of the factual situation as we perceive it from the evidence before us. But the defendants viewed the matter quite differently, and confronted the jury with a totally different picture.

Pirre, who was extremely sensitive to begin with, became even more so as a result of his difficulties. As overly sensitive persons often do, he frequently infuriated those who had to deal with him, and became a constant source of irritation in the latter days of his employment. Moreover immediately thereafter he launched massive lawsuits; this one against PDI and Time, and a Connecticut slander action against his old friends at Wendon for having told Sorenson of his efforts to stir them up against Chapman. This conduct on his part caused everyone to "close ranks" against him and— with the apparent exception of Alan Hahn—to regard him with hatred and contempt. As is almost inevitable in such situations, the persons involved reconstructed their memories of the past to conform with emotions of the present. The consequence was that all PDI witnesses whether called by plaintiff or by defendant—again with the exception of Hahn—sought to present Pirre to the jury not as an overly sensitive individual unable to cope but as a wholly evil person. For example instead of admitting—what to us, at least, was obvious— that these two warning memoranda and the firing letter were clumsy attempts to comply with Time's employment regulations, they took the wholly untenable position that every word in those documents was the truth—both literally and in implication— and that the first two had been given to Pirre in the course of a bona fide effort to cause him to mend his way. For example, although no one could rationally believe that any intelligent employer would try to appeal to a man of Pirre's sensitivity by giving him a memorandum ending "it is deeply hoped that improvement in all the above areas will be evident in order to preclude termination," such was precisely what defendant asked the jury to find.

The consequence of this approach was to give the jury the impression that all PDI personnel who appeared before them—again with the exception of Hahn[5]—were deliberately trying to blacken Pirre's reputation and lay upon him the blame for their own shortcomings. The jury's verdict was an altogether foreseeable—and quite logical—reaction to this presentation of the case.

*The questions presented by defendant's attack on the amount of damages awarded*

■ The mere fact that the jury's verdict was foreseeable and logical does not necessarily make it correct. The fact that PDI personnel may have been unfair to plaintiff—if indeed they were—or may have made unwarranted accusations in their testimony against him—if indeed they did—would not entitle plaintiff to an award of damages because of the publication of the two documents here in issue. Damages are awardable only if Pirre's reputation received some injury measurable in dollars, or if such publication caused some other actionable harm.

The jury's verdict awarded the following damages:

(a) General (which includes both monetary injury to reputation and an award for indignity) $325,000;

(b) Medical (pain and suffering and inability to work, on the theory that publication of the documents aggravated the ulcer) $75,000;

(c) Punitive damages (the expenses of prosecuting this lawsuit) $45,000.

For reasons which follow, it is our conclusion that:

(a) Plaintiff's reputation suffered no damage as result of the publication of these documents, and that the

general damages must be reduced to $45,000, which is the most we find allowable for indignity;

(b) Plaintiff failed, as a matter of law, to show any connection between the publication of the documents and the condition of his ulcer, so the award for medical damages must be eliminated from the verdict; and that

(c) The award for punitive damages must be sustained.

*Discussion*

(a) General Damages

■ Regardless of the extent, if any, to which damage may, in the absence of proof, be presumed from a published libel where malice is shown (cf. *Gertz v. Robert Welch* (1974) 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, Restatement of Torts, Second § 621 comments (a) and (b)), the record here conclusively establishes that defendant's reputation suffered no monetary damage from the publication of these two documents. Aside from plaintiff himself and those to whom he published, these documents were seen (except as incidental to this litigation) by eight persons: Messrs. Edmondson, Chapman, Hahn, Sorenson, Andel, and Brienze at PDI and Robert Steed and Lucy Werner at Time Incorporated.[6] Plaintiff's theory as to how he could have been damaged by the loss of these people's esteem is that such loss of esteem was at least partially responsible for their decision to terminate his employment. The difficulty with that theory is that as least as early as April of 1974 (before either document had been published) the termination of his employment had become inevitable because of his emotional inability to conform to the needs of the job. No monetary damage

---

5. Ironically, Hahn seemed to us to be the only one of the "PDI witnesses" who had any doubt as to the truthfulness of his own testimony. He seemed to us to be uneasy in repudiating certain remarks protective of Pirre and critical of Chapman that other witnesses had attributed to him. The other "PDI witnesses" appeared to us to be angry men who had thoroughly convinced themselves of the righteousness of their cause and the correctness of their reconstruction of past events. The jury, however, might well have concluded that they were deliberately lying.

6. See n. 4.

could therefore have been caused by the publication of the documents.[7]

This leaves open the question of how much the jury was entitled to award for personal humiliation. *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154. The parties have cited no case—and we have found none—which seems to provide a helpful guide in the situation before us. On the one hand, in contrast to the *Firestone* case, *supra*, the publication here was narrowly limited. On the other hand, as defendant should have known, the plaintiff was a man of extraordinary sensitivity who might have been expected to suffer extreme mental anguish from unjustified criticism. Taking this latter consideration into account, it seems to us that a verdict of up to $45,000 would be justified.[8]

**(b) The medical damages (injury to plaintiff's health)**

■ The conclusive answer to plaintiff's claim with respect to "medical damages" is that there is no scintilla of evidence that plaintiff's condition in any way worsened on or after October 18, 1974, the date on which the first of the two documents was published. The record shows that plaintiff's ulcers first caused his incapacitation in April of 1974, and that this was caused by the pressures surrounding plaintiff's employment. It also shows that by November of 1974 "it became apparent" that plaintiff was "making no progress". There is no suggestion that plaintiff's condition ever got any worse after the April diagnosis.

We therefore need not concern ourselves with the question that was submitted to the jury, namely, whether assuming that plaintiff's condition had worsened after October 18, 1974 would it be rational to conclude that a material factor in the causation of such worsening was plaintiff's realization that a total of five people at PDI and 2 at Time Incorporated, had seen the two documents in question. As indicated at trial, if that question were before us we would be inclined to answer it in the negative.

It follows that the portion of the jury's verdict awarding $75,000 in medical damages must be set aside.

**(c) Exemplary Damages**

PDI urges that the award of punitive damages, which was limited to plaintiff's litigation expenses, should be set aside because of the absence of a jury finding that the libels were authorized, participated in, or ratified by any of its "senior management" personnel. We reject that contention.

■ Interpreting New York law, the Court of Appeals for this Circuit has rejected the suggestion that punitive damages cannot be imposed upon a corporation absent involvement by its officers or directors in the complained-of action. *Doralee Estates v. Cities Service Oil Co.* (2d Cir. 1977) 569 F.2d 716. The *Doralee* court relied upon the New York decisions in *Corrigan v. Bobbs-Merrill Co.* (1920) 228 N.Y. 58, 71–72, 126 N.E. 260; *Gill v. Montgomery Ward & Co.* (3d Dept. 1954) 284 App.Div. 36, 40, 129 N.Y.S.2d 288; and *Rose v. Imperial Engine Co.* (4th Dept. 1908) 127 App.Div. 885, 112 N.Y.S. 8, *aff'd* (1909) 195 N.Y. 515, 88 N.E. 1130, in recognizing that under New York law the acts of "relatively important managerial personnel" could be considered corporate acts for purposes of assessing punitive damages. See also Restatement (Second), Agency § 217C; Restatement, Torts § 909; Prosser, *Law of Torts,* (4th ed. 1971) 11–12,

---

**7.** No witness who saw the documents testified to any loss of esteem for Pirre.

**8.** Defendant correctly points out that—even in the absence of any request—we should have sua sponte cautioned the jury that it was not bound by plaintiff's counsel's closing argument in which he suggested that at least $300,000 in general damages would be appropriate. *Modave v. Long Island* (2d Cir. 1974) 501 F.2d

1065, *Mileski v. Long Island Railroad* (2d Cir. 1974) 499 F.2d 1169. However, in view of our reduction of the general damages to $45,000, the error would seem to be academic. Neither of the cited cases found such an error sufficient to justify reversal. Moreover, the trial having been bifurcated, the claimed error could not have affected the finding of liability.

464. As the Court of Appeals stated in *Doralee* (569 F.2d at 722):

> "The test of who is a 'superior officer' or a 'person in authority' to bind the corporate entity to participation or ratification cannot be rigid . . . The question is whether the act or ratification is done by a person of such responsibility as to arouse the 'institutional conscience' . . The test is whether the continuing tortious conduct has been brought home to the consciousness of a relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage."

Although we have found no Connecticut cases directly on point, we believe that Connecticut, like New York, would allow punitive damages to be assessed against a corporation for the acts of its high-ranking managerial employees.[9]

PDI's contention is that Robert Sorenson, who reviewed the first libel and authored the second, did not stand high enough in its corporate hierarchy to meet the *Doralee* test. It is to be noted that defendants requested no jury instructions as to whether or not Sorenson had been sufficiently "relatively important" to meet the *Doralee* test. It is therefore doubtful whether the question is now open. Cf. *Rose v. Imperial Engine Co., supra* (112 N.Y.S. at

10). However, had such instruction been requested it would surely have been given, and the jury would have been entitled to answer the question in plaintiff's favor. Sorenson served both as head of PDI's Norwalk facility and as its director of corporate development. Such status would, in our view, be sufficient to make his conduct the basis for an award of punitive damages either under Connecticut[10] or New York[11] law.

Nor does *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 require us to set aside the punitive damage award. In *Gertz*, the Supreme Court carefully balanced the states' interest in compensating victims of injurious falsehoods against the need, recognized by the First Amendment, for vigorous and uninhibited speech. Of particular concern to the Court was the danger to speech posed by extravagant punitive damage awards unrelated to the states' legitimate interest in compensation. The Court, speaking through Mr. Justice Powell, noted (418 U.S. at 350, 94 S.Ct. at 3012):

> "In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts

---

9. In the leading Connecticut case on corporate liability for punitive damages, *Maisenbacker v. Society Concordia* (1899) 71 Conn. 369, 42 A. 67, the Connecticut Supreme Court of Errors followed the New York decision in *Cleghorn v. New York Central & H. R. R.* (1864) 56 N.Y. 44, in holding that punitive damages could not be assessed against a corporation on respondeat superior principles. Like the New York court, it took the position that corporate authorization, participation or ratification is a prerequisite for punitive damage liability. On the facts in *Maisenbacker,* which involved an assault by the floor manager of a dance given by the defendant Society, the Connecticut court did not find sufficient corporate responsibility to support an award. However, neither in *Maisenbacker* nor in any other case of which we are aware, have Connecticut courts considered corporate liability in punitive damages for the acts of high-ranking managerial personnel. In the absence of such cases, and in light of *Maisenbacker's* particular attentiveness to New York law in the area, we find New York cases especially helpful in determining the content of

Connecticut law. See Moore's Federal Practice (1978) ¶ 0.309[2]. We believe that Connecticut courts, if confronted with the issue, would follow the law of New York as stated by the Court of Appeals for this Circuit in *Doralee,* supra. We note that the New York rule is consonant with that of the Restatements of Agency, § 217C, supra, and Torts, § 909, supra.

10. *Maisenbacker,* supra, is inapposite. There is no suggestion that the dance floor manager in that case had power and responsibility within the defendant Society that in any way approaches that of Sorenson within PDI.

11. See *Doralee,* supra (regional maintenance manager); *Smith v. Little, Brown & Company* (S.D.N.Y.1967) 273 F.Supp. 870, 873 (head of defendant's juvenile book department); *Corrigan,* supra (defendant's literary editor and chief manuscript reader); and *Rose,* supra (manager of department who authored libel in name of corporation).

bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."

Because potentially-unlimited punitive damage awards may inhibit speech and because such awards, in most jurisdictions, do not serve the state's interest in compensating victims, the Court found punitive damages recoverable only upon clear and convincing evidence of knowledge or recklessness as to falsity.[12] In the instant case, the jury found knowledge or recklessness as to falsity. It was not, however, instructed that such a finding could only be premised upon clear and convincing evidence. PDI contends that the award of punitive damages should not stand because the jury was not so instructed. Because of the substantial differences between exemplary damage awards in Connecticut and those considered by the Court in *Gertz*, we disagree.

█ Connecticut's practice in awarding exemplary damages entails none of the dangers with which the *Gertz* Court was concerned. Unlike the practice of most jurisdictions discussed in *Gertz*, Connecticut does not leave the extent of punitive damage awards to juries' largely unfettered discretion. Instead it limits such awards to the costs of litigation, *Collens v. New Canaan Water Company* (1967) 155 Conn. 477, 234 A.2d 825; *Triangle Sheet Metal Works v.*

*Silver* (1966) 154 Conn. 116, 222 A.2d 220; *Hanna v. Sweeney* (1906) 78 Conn. 492, 62 A. 785, thereby largely avoiding the inhibiting effect on speech caused by the threat of awards that are not so limited. Nor are exemplary damages under Connecticut law unrelated to that state's interest, recognized as legitimate in *Gertz*, in compensating plaintiffs. To the contrary, such damages, as Connecticut courts have repeatedly emphasized, have the purpose and effect of such compensation. *Collens, supra; Doroszka v. Lavine* (1930) 111 Conn. 575, 150 A. 692; *Craney v. Donovan* (1917) 92 Conn. 236, 102 A. 640. Because Connecticut's practice in allowing exemplary damages does not suffer from the ills the Supreme Court sought to avoid in *Gertz* and because that practice protects interests respected by the *Gertz* Court, we find the award of exemplary damages here to be free from constitutional defect.

█ A more difficult question is presented as to whether we should, in the exercise of discretion, grant a new trial as to punitive damages. As to this, there is little question that if this were a bench trial and we were called upon in the first instance to exercise our own discretion, we would not find Sorenson's conduct such as to require that he or his employer be made an example of, cf. *Smith v. Little Brown & Co., supra*, 273 F.Supp. at 874. As we have indicated, it is our view that he was guilty only of bad judgment in responding to the peculiarities of plaintiff's character. However, we cannot say that the jury was unreasonable in coming to a contrary conclusion, and so do not feel that we should disturb their verdict.[12a] Once it is decided that punitive damages were permissible, there can be no quarrel with the amount. It was within the limits carefully provided by Connecticut law, and there could be no

---

**12.** Where only compensation of private plaintiffs is involved, the *Gertz* Court allowed states to award punitive damages upon a showing of negligence as to falsity. *Gertz, supra*, 418 U.S. at 347, 94 S.Ct. 2997.

**12a.** See e. g. *Samuels v. Health and Hospitals Corporation of the City of New York* (2d Cir.

1979) 591 F.2d 195, in which the Court of Appeals reversed the trial court's grant of judgment notwithstanding the verdict despite its belief that a conclusion different from that adopted by the jury "would have been reached by almost all judges." at 198.

suggestion that it is a financial hardship to the defendant. Cf. *Zarcone v. Perry* (2d Cir. 1978) 572 F.2d 52, 56 (burden is on defendant to show his modest means in mitigation of punitive damages).[12b]

*PDI's Other Claims*

(a) Publication

Focusing on the limited distribution of the libels, PDI argues that publication, a necessary element of plaintiff's defamation claim, is here absent.

██ Publication is a simple concept. "A defamatory writing is not published if it is read by no one but the defamed [person]. Published, it is, however, as soon as read by any one else." *Ostrowe v. Lee* (1931) 256 N.Y. 36, 38, 175 N.E. 505 (Cardozo, J.). PDI concedes that the libels here were indeed read by persons other than John Pirre.[13] It contends, however, that because those persons were PDI officers and employees, no publication occurred. We disagree.

██ Without deciding whether the distribution to personnel at Time Incorporated could support a jury finding of liability,[14] we hold that the circulation of the libels within PDI was an actionable publication. We are not impressed with the argument that communications between employees or indeed officers of the same corporation are not communications to a third person. The New York Court of Appeals rejected this broad principle in *Kennedy v. Butler, Inc.* (1927) 245 N.Y. 204, 156 N.E. 666,[15] holding that the plaintiff in that case stated a cause of action for libel by alleging that the corporate defendant had circulated a defamatory pamphlet among managers of retail stores who were in its employ. The *Kennedy* approach is consonant with the position taken by the Restatement[16] and that urged by Dean Prosser and other commentators.[17]

Defendant contends that different considerations should apply when the individuals involved in the communication are officers of the defendant corporation. We see no basis for this distinction. While corporate officers may be, as defendant contends, the embodiment of the corporation, they remain individuals with distinct personalities and opinions, which opinions may be affected just as surely as those of other employees by the spread of injurious falsehoods. It is this evil that the law of defamation is designed to remedy. To find no inter-personal communication when a corporate employee speaks to a corporate officer would be to ignore the distinct personalities of the human beings involved. We do not believe that the courts of New York or Connecticut

**12b.** Defendant having offered no evidence on the subject, we do not consider the extent to which PDI's resources were coextensive with, or independent of, those of Time, Inc. See Zarcone, supra.

**13.** The circulation of the libels by Pirre himself does not, of course, constitute an actionable publication.

**14.** The only distribution to persons other than PDI personnel was Robert Edmondson's circulation of the final warning memo to Robert Steed and Lucy Werner (and perhaps Dr. Kirkham, see n. 4) at Time Incorporated. There was no jury finding of malice on his part to defeat the qualified privilege. Accordingly, PDI cannot be held vicariously liable for his actions. The jury did, however, find malice on the part of Jack Andel, the author and original distributor of the memo. Since no evidence supports the claim that Pirre's injuries were in any way caused by distribution beyond PDI's personnel, we need not consider whether any awareness on Andel's part of the likelihood of

subsequent publication would be a sufficient basis for a finding of liability for such publication. Cf. *Macy v. New York World-Telegram Corp.* (1957) 2 N.Y.2d 416, 161 N.Y.S.2d 55, 141 N.E.2d 566; *Raines v. New York Press Co.* (5th Dept. 1895) 92 Hun. 515, 37 N.Y.S. 45; Seelman, Libel and Slander in New York (1964) § 149.

**15.** Neither our own research nor that of the parties has uncovered any Connecticut case law on the question of intra-corporate publication. Following the established choice of law principles of the forum state, New York, we presume that Connecticut's law on this question is in harmony with New York's.

**16.** Restatement of Torts, Second (1977) § 577, comment (i), p. 204.

**17.** Prosser, The Law of Torts (3d ed. 1964) § 108; Hanson, Libel and Related Torts, Vol. 1 (1969) § 666; Note, 38 U.Va.L.Rev. 400 (1952).

would ignore this reality in defining the law of those states.[18]

 Nor do we find merit in defendant's claim that publication is negatived by participation of the recipients of the libels in a conspiracy to harm Pirre.[19] While the existence of such a conspiracy would be relevant to the question of damages,[20] New York courts have found publication where the third party participated directly in the production of the libelous documents themselves. See *Ostrowe v. Lee, supra* (Cardozo, J.) (dictation to a stenographer employed by an individual defendant); *Lux-Brill Productions, Inc. v. Remco Industries, Inc.* (S.Ct.N.Y.Co.1965) 48 Misc.2d 697, 265 N.Y.S.2d 440 (dictation to corporate stenographer by agent of corporate defendant); *Bradley v. Connors* (S.Ct.Richmond Co.1938) 169 Misc. 442, 7 N.Y.S.2d 294; *Walrus Manufacturing Co. v. Excel Metal Cabinet Co.* (W.D.N.Y. 1957) 161 F.Supp. 840. But see *Burstein v. Movielab, Inc.* (S.Ct. Nassau Co.1964) N.Y. L.J., March 13, 1964, p. 17, aff'd 21 A.D.2d 965, 252 N.Y.S.2d 404; *Dommel v. Triumph of Europe, Inc.* (S.Ct.N.Y.Co.1960) 26 Misc.2d 1070, 208 N.Y.S.2d 463; *Loewinthan v. Beth David Hospital* (S.Ct.N.Y.Co. 1938), 9 N.Y.S.2d 367; *Mims v. Metropolitan Life Ins. Co.* (5th Cir. 1952) 200 F.2d 800 (applying New York law). While New York law is by no means settled, we believe that the better reasoned decisions are those finding publication even where the recipient of the libel is directly involved in its production.[21] It follows that participation by the recipient in some less direct manner should be no bar to plaintiff's claim. Admittedly, corporations, like other business forms, have a legitimate interest in free communications between their officers and employees on business-related matters. This interest, however, is adequately—and exclusively—protected by the qualified privilege attaching to such communications. See *Kennedy, supra* ; Prosser, *The Law of Torts* (3d ed. 1964) § 108. Questions of privilege should not be confused with the issue of publication.[22] We find no merit in defendant's claim that there was no publication as a matter of law.

(b) Burden of Persuasion

Defendant contends that we erred in charging that plaintiff could prove malice by a preponderance of the evidence, instead of charging that clear and convincing proof was required. Defendant reads *Dacey v. Connecticut Bar Association* (1976) 170 Conn. 520, 368 A.2d 125 and the body of First Amendment defamation law as com-

**18.** Surely, if a truck negligently driven by a corporate employee ran over another employee or officer of the same corporation, no court would dismiss a claim against the corporate employer on the theory that the corporation had merely injured itself. We find equally untenable the suggestion that a corporation merely speaks to itself when its officers or employees converse.

**19.** Defendant's theory is apparently based upon language in *Kennedy* leaving open the question of whether there would be publication where the defamation was communicated only to another participant in the action complained of. Defendant broadly construes the "action complained of." Since in a defamation case plaintiff is complaining of a libel or slander, and since this discussion in *Kennedy* appears in the context of consideration of whether dictation to a stenographer results in publication, we believe that a narrower construction is at least as plausible as that advanced by defendant.

**20.** If recipients of a libel do not believe the libel to be true, no injury to reputation would result. The extent of damage should not be confused with the issue of whether publication has occurred.

**21.** See Seelman, Law of Libel and Slander in New York (1964) § 123.

**22.** *Church of Scientology v. Green* (S.D.N.Y. 1973) 354 F.Supp. 800, relied upon by defendant, confuses these analytically distinct issues. Defendant also relies on *Wohl v. Millay* (S.Ct. N.Y.Co.1977) N.Y.L.J. Dec. 5, 1977, p. 10 and *Scanlon v. Mount Matsushita Electrical Corp.* (S.Ct.Queens Co.1971), N.Y.L.J., June 23, 1971, p. 21, aff'd 37 A.D.2d 1049, 327 N.Y.S.2d 596. *Wohl,* which discusses communications by plaintiff's wife to a business associate of plaintiff, is wholly inapposite. In the unreported decision in *Scanlon,* the court found no publication where a corporate employee allegedly defamed plaintiff to plaintiff's supervisor, who was also an employee of the defendant corporation. *Scanlon* has never been cited by any other court. We believe that case to have been wrongly decided.

pelling the application of the higher standard here. We disagree.

■ Proof of malice by clear and convincing evidence has long been required where the plaintiff is a public official or a public figure. In *New York Times v. Sullivan* (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Supreme Court held that a damage award to an elected public official could not be constitutionally sustained absent convincingly clear proof of malice (at 285–286, 84 S.Ct. 710). The Court extended this requirement to libel claims by public figures in *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 and, by plurality opinion in *Rosenbloom v. Metromedia, Inc.* (1971) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, to actions brought by private individuals for defamations concerning the individual's involvement in matters of public interest. The formulation endorsed by the *Rosenbloom* plurality was, however, short-lived. In 1974, in *Gertz v. Robert Welch, Inc.,* supra, the Court found the *New York Times* standard inapplicable to claims by private individuals. The Court there observed (418 U.S. at 347, 94 S.Ct. at 3010):

> "So long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

Since there is no claim here that Pirre is anything but a private individual, this line of cases does not aid defendant.

■ Defendant suggests that the strength of the free speech interests here—that is, those underlying its qualified common law privilege for intra-business communications—compels application of the burden of convincingly clear proof.[23] By focusing on the context and nature of the speech, rather than the status of the plaintiff as a public or private individual, defendant's approach is akin to that of the *Rosenbloom* plurality, which the Court repudiated in *Gertz.* Since Pirre is a private person, we conclude that beyond the minimal restrictions spelled out in *Gertz,* the constitution leaves it to Connecticut to define the appropriate standard of proof.

Defendant reads *Dacey v. Connecticut Bar Association* (1976) 170 Conn. 520, 368 A.2d 125, as adopting an applicable standard stricter than mere preponderance. The plaintiff in *Dacey* was a financial consultant, lecturer and author of three books, who caused a stir by publishing a book entitled "How to Avoid Probate!" Subsequent to the publishing of this book, the defendant Bar Association received a number of inquiries about the book, which it interpreted as reflecting widespread public confusion concerning the issues Dacey had raised. Its response was to publish a pamphlet entitled "Understanding Probate! or Don't be Dead-Wrong!" in which it warned that "Dacey believers" could face jail terms for following his suggestions. In his subsequent defamation action, Dacey won a $60,000 damage award. On appeal, the Connecticut Supreme Court ordered a new trial because of the failure of the lower court to have instructed the jury that Dacey bore the burden of proving malice with convincing clarity. As we read *Dacey,* that case does no more than follow the applicable standard constitutionally required in defamation actions by public figures. See *New York Times, supra; Curtis Publishing, supra.* Since Pirre cannot by any stretch of the imagination be so described, *Dacey* does not control this case.

---

**23.** Defendant contends that the speech interest here is of the same nature and magnitude as the First Amendment interests in criticism of public officials and public figures. To be sure, commercially-related speech, such as that here, is not "wholly outside the protection of the First Amendment," cf. *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346; *Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810. It is not, however, related to the central role the First Amendment plays in guaranteeing our capacity for self-government. See *1st Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765 at 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *New York Times v. Sullivan,* supra, and cases cited therein; also see *Va. Pharmacy Bd.,* supra (Stewart, J. conc.).

 Malice must be proven under the constitution by public figure plaintiffs and under common law where the communication is qualifiedly privileged. It does not necessarily follow, however, that the burden of proof on that issue is the same in both situations. Defendant has cited no cases where a Connecticut or New York court has required a private plaintiff to meet the higher standard of proof. We conclude that the portion of the charge relating to plaintiff's burden of persuasion correctly stated Connecticut law.

(c) Other Issues

 PDI's other claims merit less discussion. We perceive no inconsistency in the jury's conclusions that in publishing the libels Andel and Sorenson acted within the scope of their employ but exceeded the bounds of the qualified privilege. That privilege, for communications in which the participants have an interest, may be defeated—and was defeated here—upon a showing of "actual malice." *Restatement of Torts, Second* § 600. Actual malice is a term of art. In ordinary usage, one acts with malice if motivated by spite or ill-will. An employee motivated solely by ill-will would be off on a frolic of his own and serving no interests of his employer.[24] *Restatement of Agency, Second* (1958) § 235, comment (a). In the sense used here, however, one acts with actual malice if he communicates with knowledge of the falsity of his communication or with reckless disregard for its truth. An employee so acting could well be acting within the scope of his employ, that is, performing work of the same general nature as that authorized for the purpose of serving his employer. *Restatement of Agency, Second* §§ 228, 229. The comment to the defamation section of the *Restatement of Agency, Second,* section 247, recognizes that an employer may be liable under respondeat superior principles for the unprivileged defamations of its employees:

". . . If the scope of employment of a servant includes the making of statements concerning others which he believes to be true and privileged, the master is subject to liability for untrue or unprivileged defamatory statements concerning such others, if the statements are otherwise within the scope of the servant's employment."

We believe that the jurors could well find on the evidence before them that Andel and Sorenson acted with actual malice and within the scope of their employment. Neither finding, in our view, precludes the other.

 Finally, defendant argues that it was prejudiced by a wide variety of evidentiary rulings which permitted plaintiff to make inflammatory arguments to the jury. Regardless of the technical basis of the individual rulings, our review of the record satisfies us that no substantial evidence was presented that was not relevant to the question of whether or not the writers of the two documents at issue honestly believed their content to be true. Moreover, some of the slander evidence about which defendant complains, the statements about Pirre's attempts to enlist Wendon Company's aid in the move to oust Chapman, gave defendants the opportunity to offer the testimony of the Wendon witnesses, who were the only two witnesses at the trial who materially advanced the defendant's case. As to the other evidence about which defendant complains, we find none of it to have had any substantially prejudicial effect.

*Conclusion*

To summarize, we grant PDI's motion to set aside the jury's verdict on the issue of medical damages and deny the remainder of its motion for judgment notwithstanding the verdict. We also deny PDI's motion for a new trial, but, finding a compensatory damage award of $45,000 to represent the upper limit that the jury could reasonably award, will order a new trial unless plaintiff consents within thirty (30) days to a reduction of compensatory damages to that amount.

SO ORDERED.

---

**24.** Nor would his action be privileged. Restatement of Tort, Second § 603, comment (a).